914 P.2d 1320

**STATE of Arizona, Appellee,**

v.

**Carolyn Ann WALKER, Appellant.**

**STATE of Arizona, Appellee,**

v.

**Ronald G. TAPP, Appellant.**

Nos. 1 CA–CR 93–0057, 1 CA–CR 93–0109 and 1 CA–CR 93–0362.

Court of Appeals of Arizona,
Division 1,
Department C.

Nov. 2, 1995.

Review Denied April 23, 1996.

Grant Woods, Attorney General by Paul J. McMurdie, Chief Counsel, Criminal Appeals Division, Phoenix, for Appellee.

Debus & Kazan, Ltd. by Larry L. Debus, Tracey Westerhausen, Phoenix, for Appellant Ronald G. Tapp.

Miller & Miller, Ltd. by Richard K. Miller, Phoenix, for Appellant Carolyn Ann Walker.

## OPINION

NOYES, Judge.

In February 1991 a grand jury in Maricopa County indicted twenty-one persons, most of whom were legislators or lobbyists, for criminal conduct that was captured on audio and video tape during a sting operation known as "Azscam." Two defendants went to trial: State Senator Carolyn A. Walker and lobbyist Ronald G. Tapp. Their trial began in April and concluded in November 1992. Walker was tried on ten felony counts and was found guilty of two, filing a false campaign contribution statement and conspiracy. Tapp was tried on twenty-three felony counts and was found guilty of twelve, most of which were bribery charges. Walker was sentenced to prison for four years to be followed by three years on probation and was ordered to pay restitution of $24,660. Tapp was sentenced to prison for concurrent terms ranging from four to ten years and was ordered to pay restitution of $46,080. Each filed appeals, which we consolidated. We have jurisdiction pursuant to Arizona Revised Statutes Annotated ("A.R.S.") sections 12–120.21(A)(1) (1992), 13–4031 (1989), and 13–4033(A) (Supp.1995).

### I. Facts

Trial lasted six months and most of the evidence consisted of about four hundred audio and video tapes. The State played

tapes for the jury from May to September. As required by law, we view the evidence in the light most favorable to sustaining the verdicts, resolving all reasonable inferences against Appellants. *State v. Atwood,* 171 Ariz. 576, 596, 832 P.2d 593, 613 (1992), *cert. denied,* 506 U.S. 1084, 113 S.Ct. 1058, 122 L.Ed.2d 364 (1993).

### Stedino and Bartlett

The operation that developed into Azscam began in 1989 when Joseph Stedino, a con artist whose life experience included three trips to prison and recent undercover work for the FBI, asked a local law enforcement contact about social gambling in Phoenix. The contact called James Keppel, Chief Deputy of the Maricopa County Attorney's office. Keppel called Stedino and, after talking with him, said the County Attorney might hire him. Stedino came to Phoenix and had three interviews with Deputy County Attorney George Mount and Detectives Gary Ball and Dennis Davis of the Organized Crime Bureau of the Phoenix Police Department. In August 1989 the County Attorney hired Stedino as a salaried employee ($3,000 per month, plus all expenses) to work undercover in the Phoenix social gambling scene.

Stedino assumed the false identity of "J. Anthony Vincent" and claimed to be a Las Vegas "businessman" who was interested in bringing regulated casino gaming to Arizona. Stedino became a regular gambler and card dealer in Phoenix bars for the next four months and developed nothing of significant prosecutorial appeal—but he did meet the character who made the claims that began Azscam. In about December 1989 Gary Bartlett started telling Stedino that many Arizona legislators could be bribed and that he, Bartlett, was friends with many of them and knew their weaknesses.

The State had no information—not even any rumors—about bribery in the Arizona legislature, and it knew little about Bartlett other than he claimed to be a judge and was not, although he had once been a short-term magistrate for the Town of Guadalupe. But Bartlett was well known in the Phoenix social gambling scene, and the State decided to see if he was well known in the Arizona political scene as well. Stedino was directed to have Bartlett take him on two social visits to the State Capitol.

When Stedino reported that Bartlett was warmly greeted by various legislators and aides at the Capitol, the Maricopa County Attorney's Office and the Phoenix Police Department decided to begin a sting operation to determine who, if anyone, in the Arizona legislature was predisposed to accept a bribe in return for his or her promise to vote in favor of pro-gaming legislation. The sting was financed by the "RICO" fund, a statutory creation of the legislature that was intended, in part, to supplement law enforcement budgets with assets seized from wrongdoers. *See* A.R.S. §§ 13–2314 and –2314.01 (Supp. 1995), and –4315 (Supp.1995). All State payments to Stedino—and all payments by him to others—came from the RICO fund, as did other Azscam direct expenses such as furniture and equipment. (A County employee testified that RICO-fund expenditures on Azscam from August 1989 through April 1992 totaled $807,719.)

In February 1990 the State authorized Stedino to hire Bartlett as a lobbyist at $1,000 per week and to open an office. Stedino paid $10,500 for six months' rental of an office in the area of 24th Street and Camelback, bought furniture, and ordered a sign reading "Executive Offices of Gary L. Bartlett." The State wired the office for video and audio recording and set up a surveillance room in the adjoining office. The scam was that J. Anthony Vincent was a front man for out-of-state casino builders who planned to spend millions of dollars to bring regulated casino gaming to Arizona. Assisted by lobbyist Bartlett, Vincent would offer bribes to legislators in return for their promise to support legislation that would allow regulated casino gaming in Arizona.

The office was ready by March 15, but by then Stedino was having problems with Bartlett. For example, Stedino's written reports to the State advised that Bartlett "is about 15 years old emotionally" and "does not recall from hour to hour what he says."

## Lobbyist Tapp

On March 21 Bartlett introduced Stedino to Appellant Ronald G. Tapp, a bail bondsman and lobbyist for the bail bond industry who had once run for the Arizona House of Representatives and been defeated in the primary by Donald J. Kenney. At their first meeting, Tapp told Stedino he could deliver Kenney's vote. Tapp and Stedino had many conversations over the next few days, and on April 2 Tapp agreed to be a lobbyist for Stedino.

The day after Stedino hired him, Tapp returned to the office and said, "You can go out and celebrate." When Stedino asked why, Tapp said, "I got the quarterback" and explained that he had met with Kenney and Kenney had said he could "produce 25 votes right now" for legalized gaming and that he would "direct you to people and tell you what their hot buttons are." Stedino said, "You got more done in one day than [Bartlett and I] got done in a month."

When Stedino asked if he had given Kenney anything, Tapp laughed and replied, "I bought lunch." When Stedino said it would take about $25,000 to fund Kenney's campaign, Stedino said he needed Kenney to know that if Stedino funded his campaign, he expected his vote. Tapp said there would be no problem with that. Tapp also said that one of the things he had told Kenney was, "I happen to like you and I happen to think that you're honest." Stedino said, "That's the best thing you can tell a guy."

After advising Stedino that Arizona laws place a $220 limit on an individual's contribution to one campaign, Tapp said: "Now there are gonna be some people, okay, that we can lay 5 to 10 thousand dollars down in envelopes and walk away, okay. We're gonna find some of those. There's no doubt in my mind." Later, when Stedino observed that "everybody has their price, everybody has a button," Tapp agreed. When the meeting ended, Stedino gave Tapp $500 "for what you did with Kenney," and Tapp agreed to set up a meeting with Stedino and Kenney.

During a phone conversation on April 8, Stedino told Tapp, in reference to legislators: "If they're not in your pocket, you can't count on their vote." Tapp said, "That's right." Stedino said, "I got to buy as many votes as I can buy." Tapp agreed. Tapp suggested that he work the Republicans and Bartlett work the Democrats, but Stedino fired Bartlett the next day, April 9. The sign for the office was changed to "Executive Offices of J. Anthony Vincent," and Tapp went on the Azscam payroll at $1,000 a week. Tapp also requested, and Stedino promised, that when casinos opened in Arizona, Tapp would handle the insurance business for casino employees. Tapp said that this business would yield commissions of about a million dollars a year.

During an April 23 office meeting, Tapp told Stedino, "When I start talking to people in earnest, I wanna make sure this is a secure facility. Otherwise we have no conversations." Tapp also said, "It would not hurt us if we employed someone to hang out in Rocky Point, Mexico with a long range camera and take necessary pictures that need to be taken." Stedino said, "Of who?" Tapp explained, "I discovered something. A lot of judges are hanging out in Rocky Point, Mexico ... and remember we can't do anything with the damn court systems in this state simply because these f____ers don't let them throw elections."

The next day, April 24, Tapp and Stedino had a three hour meeting during which they looked over a pamphlet of Arizona Senators and Representatives and decided whether to put a "B" next to the name for "buy," or a "P" for "possible," or a "DK" for Kenney to contact. Regarding several legislators, Tapp said he or she could be bought "but it has to be done with class," or words to that effect. Among Tapp's other assessments were: "I think we can probably control [her] without buying her, although I think that probably funneling some campaign contributions into her campaign's gonna help us"; "I think that it would be a mistake to approach him because everybody in town might know what the hell we're doin' "; "Uh, [he] I think could probably be purchased.... We just need to find his hot button."

About eighty minutes into the April 24 meeting, Tapp casually mentioned—completely off the subject being discussed—that

he had bought a judge the night before last, referring to Justice of the Peace Donald Stump. "That was a cash contribution," he said, "which I'll turn it in on my expense account later—if judges are okay." Stedino responded, "Judges are good.... Do we need JPs or judges?" Tapp answered, "A JP can release anybody in the State of Arizona at any time with a f___ing signature. Need I say more?"

Before the meeting ended, Stedino gave Tapp $2,700 with the understanding that Tapp would give most or all of it to a certain legislator if Tapp heard the right answers on legalized gaming. While Stedino counted the money, Tapp remarked, "This little conversation we just had today would constitute conspiracy." When Stedino asked, "What did we do?" Tapp stated, "Conspiracy to buy public officials." Repeating something Tapp had once said to him, Stedino joked, "I told you never to use that word 'buy' in front of me." Tapp laughed.

On April 30, Tapp and Kenney came to the office and presented Kenney's budget, which Tapp had helped inflate to $55,000. Of that amount, $45,000 was for Kenney's legal fees and expenses and $10,000 was to parcel out to members of the House to increase Kenney's influence with them and secure their support for Stedino. At the end of the meeting, when Stedino was ostentatiously counting hundred dollar bills, Kenney looked up at the ceiling and said, "Wave to the camera." He was quickly assured that there were no cameras, that Tapp had the room swept for bugs the day before (which was true). Kenney then said, "I remember those video tapes of the Abscam trial." When Stedino asked, "Did I give you $55,000 or didn't I? Tell me, so I know in case I'm ever asked," Tapp was the one to answer, saying, "You paid $55,000 in legal fees to your tax advisor at the recommendation of your insurance advisor." Stedino said, "Can you live with that?" and Kenney replied, "Sure."

During this April 30 meeting, Stedino offered Kenney the same kind of "back end" riches he had promised Tapp and would promise others. The "back end" referred to what the person wanted when casinos-by-Stedino were open for business in Arizona.

Stedino assured everyone that when this happened, it would bring billions of dollars to the state and Stedino and his associates would get rich and so would everyone on their coattails. Stedino tempted potential bribe-takers with back end riches to be had from well-paying casino jobs, such as bell captain or entertainment director, or lucrative casino business opportunities such as employee insurance, shrimp concessions, gift shops, or real estate.

When Stedino asked Kenney what he had in mind for the back end, Kenney said he'd have to think about it. Tapp then remarked that Kenney would like to get elected to Congress and it would take $750,000 for the campaign. Stedino asked Kenney whether he was looking for $750,000 on the back end. Kenney said he was surprised by the discussion and was not sure if he wanted to go to Congress or become Speaker of the Arizona House of Representatives. Kenney then suggested that, as an alternative, possibly his law firm could handle a portion of Stedino's legal business. The conversation returned to the cash in Kenney's gym bag. Stedino said, "You can call this anything. Call it a gift, call it legal fees, the bottom line is that I want you to leave here today with your $55,000 understanding that it's really in reality, it's for your vote, sponsorship." Kenney said, "I understand that exactly." Tapp laughed.

When Kenney explained that he was nervous because "well a lot of it's paranoia. You know these goofy damn [campaign] laws," Stedino cut him off with, "We're all paranoid. We all know what we're doin'." Tapp said, "I am the most paranoid son of a bitch in the world. Remember I see this s___ daily. And I know more about what goes on in this state than anybody else." As Kenney was about to leave, Stedino had him shake hands on "our deal." Stedino asked, "Do I have your vote on legalized gaming?" Kenney replied "Yes," and Stedino said, "You have my $55,000 and I have your support and your sponsorship?" Kenney agreed and said, "I'm just the quarterback, you guys are the coaches."

Stedino's reason for repeatedly having Kenney acknowledge their "deal" became ap-

parent when Kenney was momentarily out of the room and Stedino said to Tapp, "I'm sorry I had to rape him like that, he has to understand the rules." Tapp said, "That's no problem." Stedino continued, "He's gonna come with that naive s___ and I don't wanna hear it. He knows I give him the money for his vote and that's the important thing." Tapp's response was, "Burn those f___in' papers," referring to Kenney's budget.

With both Kenney and Tapp lobbying for Stedino, and with Stedino being generous with RICO funds, legislators and lobbyists (and others) began coming to the Azscam office. Many tried to impress "Tony Vincent" with what they knew and what they could do, giving him the inside scoop about Arizona politics, identifying who the "players" were, who could be trusted to take a bribe, who was stupid, who was "a wacko," who would "f___ his mother," and on and on. The Azscam tapes look like episodes of a tabloid talk show called "Who's for Sale in Arizona?" Stedino, who had once been a Las Vegas TV talk show host, was directed by police and prosecutors who watched and listened in the next room and sometimes called in with advice. Stedino would take the call and receive the advice while ad-libbing a cover story for the benefit of his guest.

### Senator Walker

Appellant Walker had no contact with Stedino until he returned her telephone call on September 5, 1990, and she came to his office the next day. Walker, who had a history of introducing pro-gaming legislation, readily agreed to sponsor Stedino's pro-gaming legislation and to obtain a co-sponsor. At their first meeting, Walker accepted $660 from Stedino and asked, "You want me to list this under your name?" Stedino said he preferred that she not do that and Walker stated, "Then I'll just list it as miscellaneous."

As the conversation continued, Stedino asked what she needed for her campaign and Walker told him "about $5,000 to get out of debt." When Stedino asked, "You got somebody I can put it through?" Walker replied, "It will be given to me through a fund raiser." Stedino pulled out a stack of bills,

counted out $5,000, and handed it to Walker. She put it in her purse. Stedino said, "Call it a fund raiser, call it what you wanna call it. Just know Tony's your friend." Walker said, "Tony, you'll have me for a friend for the rest of your life." As the discussion continued, Walker said, "I'm trying to position myself that I can live the good life and have more money." Stedino cautioned that the money he gave her "goes to the grave now with me and you." Walker replied, "If it doesn't, both of us are in serious trouble." Stedino asked what Walker would say if anyone asked if he had given her any money. Walker said, "$660." Stedino corrected that to $220 each from him, his wife, and his niece.

On September 18, Walker came back to the office. After a long, casual conversation, Stedino asked, "What can I do for Carolyn? We're back to that question." Walker responded, "Carolyn needs money," and Stedino asked how much. Walker said, "Ten thousand would get me out of financial debt.... Actually, I'd rather have fifteen but ten would get me out of debt." Stedino asked, "Do you want 10 or 15?" and Walker answered, "I'd like 15." Stedino asked if she was committed to him and she said, "I was committed to you regardless." Stedino took a stack of hundred dollar bills out of his desk and began counting. When Walker asked how she should launder the money, Stedino advised her to spend it on tangibles. Walker took the money. As the conversation continued, she asked, "Tony, would you like to own a TV station?" and described an opportunity to invest in a new television station. She said, "[I]f you are interested, we can get it. Of course I'd like a small percentage of ownership." Stedino said, "Hey I wouldn't take it if you didn't get a piece of it." As she rose to leave with $15,000, Walker said, "Thank you, my dear."

On October 3 Walker came to Stedino's office and he gave her $1,220 in cash for tickets to a fund raising dinner for freshman Democrats. On October 6 another potential "quarterback," Representative Bobby Raymond, came to the office and listened to Stedino pitch the benefits of regulated casino gaming for a while, then cut him short with:

"Understand where I'm coming from. I don't give a f___ about issues.... I do deals." Raymond said he could produce fourteen votes in the House, and the way he worked was that he did not funnel money to caucus members until after they had committed to the issue. Explaining that his political style was direct ("You give me what I want, I give you what you want"), Raymond said that his favorite line on an issue was, "What's in it for me?" As Stedino was giving Raymond $10,000 at the end of this meeting, Raymond uttered the same conscience-revealing quip as Kenney: He looked around and said, "You got a camera in here taping all this?" On October 8 Stedino told Walker that Raymond was "with him." Walker said she thought he would be.

During Walker's November 19 visit Stedino let her know he was interested in backing legislation for private prisons. When Walker said she had no problem with private prisons as long as they were built with union labor, Stedino assured her they would be. Walker then said she wanted to build a recording studio. When Stedino asked what she needed, Walker said, "Probably anywhere from a half million to $750,000." After Stedino said he would talk to his associates about venture capital for Walker, she asked, "Could you make me a small advance ... about four or five thousand?" Stedino said, "No problem" and counted out $4,000, saying, "This ain't part of the loan. This has got to do with me and you and private prisons." Walker said, "I'm telling you you got my word on it. This ain't about private prisons. I already told you where I am." Stedino put the cash on the desk and Walker said, "God bless you," then counted the money and put it in her purse. As she was leaving, Walker thanked him, gave him a hug and said, "I'm on board with ya. Let me tell ya."

On January 10 Walker came to the office and said that a legislator had warned her to stay away from Stedino because some members had asked Department of Public Safety sources about him and had been told that he was clean but "he's got some friends." Stedino assured Walker there was no problem but asked if anyone could trace his money to her. Walker said she did not think so, she had only listed $220 from Stedino and $220 from his wife. (The disparity between what Walker received from Stedino and what she disclosed on her October 29 campaign finance statement—and her conversations with Stedino about those matters—supports her convictions for filing a false campaign contribution statement and conspiracy. Sufficiency of the evidence is not an issue on appeal.)

On Saturday, February 2, 1991, the morning newspaper featured a well-informed article exposing Azscam in great detail. Three days later the Maricopa County Attorney's Office filed a 146 page, 102 count indictment of Bartlett, Tapp, Kenney, Stump, Walker, Raymond, and others.

## II. Law

### Destruction of Notes

■ Both Walker and Tapp claim that their cases should have been dismissed because Stedino deliberately destroyed material evidence, namely, author Dary Matera's notes of his conversations with Stedino. Matera, the ghostwriter for Stedino's book about Azscam, had filled ten to twelve legal pads with handwritten notes during his extensive conversations with Stedino. Writing a book was not part of Stedino's contract with the County Attorney's Office; it was a personal venture of Stedino's.

On learning that Matera had notes, Walker's counsel subpoenaed them and Matera moved to quash the subpoena, claiming that it violated the Media Subpoena Law, A.R.S. section 12–2214 (1994) and the "qualified reporter's privilege." The trial court denied the motion and ordered Matera to produce the notes. Matera filed a petition for special action in the court of appeals, which affirmed the trial court. *Matera v. Superior Court*, 170 Ariz. 446, 825 P.2d 971 (App.1992). Matera's petition for review by the supreme court was denied in March 1992. *Id.* By that time, however, Matera had announced that he had given the notes to Stedino in late 1991. Stedino confirmed that he once had the notes but claimed that he no longer had them; he had thrown them away because they were "cluttering up my house and I couldn't read them anyway."

Appellants asserted that Stedino's destruction of this evidence violated their right to due process of law under the United States and Arizona Constitutions. *See* U.S. Const. amend. XIV; Arizona Const. art. 2, § 4; *Arizona v. Youngblood,* 488 U.S. 51, 57–59, 109 S.Ct. 333, 337–338, 102 L.Ed.2d 281 (1988); *State v. Youngblood,* 173 Ariz. 502, 507, 844 P.2d 1152, 1157 (1973). In April 1992 the trial court held a hearing and denied the motions in a minute entry that explained, in part:

> The court finds that under the unique circumstances here that the defendants' due process rights were not violated. First, no State action was involved in the destruction of the notes. Stedino was not acting as an agent of the State while he was working with Matera. Secondly, the bulk of the evidence in this case consists of video and audio tapes of Stedino interacting with the defendants. This evidence speaks for itself and can be assessed by the jury. Third, Stedino has been extensively examined by both defendants. Also, Matera has been interviewed and can be called as a possible impeachment witness. Fourth, the notes, at best, would be impeachment evidence. There is no showing it would negate guilt here. *See Arizona v. Youngblood,* 488 U.S. 51 [109 S.Ct. 333, 102 L.Ed.2d 281] (1988). Since both Stedino and Matera are available for trial, they can be cross-examined and the jury can determine their credibility. Fifth, any impeachment evidence contained in the notes would be cumulative to the massive amount already accumulated....

> Therefore, in light of the above, and the record as a whole, the court finds that no State action was involved in the destruction of the notes as they belonged to Matera. Also the court finds that the potential evidence lost because of the alleged destruction of the notes does not warrant dismissal as the evidence is cumulative impeachment evidence.

We agree with the trial court's ultimate conclusion, and with all of its findings except those relating to whether Stedino was a state actor regarding destruction of the notes. The State conferred an extraordinary amount of benefits and protections on Stedino during Azscam, some of them quite questionable,[1] and whether he was a state actor

---

1. Stedino was a salaried employee of the Maricopa County Attorney's Office ("the State") from August 1989 through trial in 1992. The State provided him with a car, all expenses, and utilities for his residence. In August 1990 Stedino's $3,000 per month salary was raised to $3,500. After Stedino's address appeared in the newspaper in February 1991, the State moved him into a new home and paid him an additional $900 per month housing allowance.

 —In December 1989 Stedino and the State signed an agreement providing that Stedino "may receive from time to time a per cent of proceeds received by the County Attorney's Office by final [RICO] judgment." (Stedino never received a RICO bonus, but the agreement itself is indicative of his special relationship with the State.)

 —In December 1989, Phoenix police arrested Stedino in a restaurant parking lot after finding him in possession of two concealed weapons—a .357 magnum in his pocket and a .380 automatic on his hip. On instructions from Azscam detectives, Stedino was released. The State never charged Stedino with these crimes, and it returned the weapons to him—knowing that his three prior felony convictions disabled him from lawfully possessing deadly weapons. *See* A.R.S. §§ 13–3101(6)(b) (Supp.1995) and –3102(A)(4) (Supp.1995).

 —In 1992 Stedino lied at an Azscam deposition by saying that his supervisor, George Mount, had never been to his home for dinner. Claiming that Mount had told him to lie, Stedino produced secret tape recordings of conversations he had with Mount. Stedino and Mount were indicted in a prosecution handled by the Attorney General's Office. Stedino was allowed to plead guilty to a misdemeanor. Charges against Mount were later dismissed.

 —Appellants discovered that Stedino suffered from a panic disorder, was addicted to a prescription-only psychotropic drug, and had been fraudulently obtaining prescriptions for that drug (Tranxene) from three doctors at the same time. This behavior exposed Stedino to prosecution for numerous class 1 misdemeanor violations of A.R.S. section 13–3406 (Supp.1995). The State gave him immunity.

 —The State did not give Stedino immunity and force him to identify who violated State law by furnishing him (and Matera) with a complete copy of the Azscam grand jury transcripts; Stedino was allowed to invoke his Fifth Amendment privilege to that question and to about seventy others he was asked during Azscam proceedings.

 —In May 1992, after Appellants' counsel had aggressively explored some of the above-referenced matters, the State appointed a deputy county attorney to "act as counsel for Mr. Stedi-

for purposes of a due process analysis regarding destruction of the Matera notes is a difficult question. Because we can decide the due process issue without reaching the "state actor" question, we do so. Assuming that Stedino was a state actor when he destroyed the Matera notes, we agree that his misdeed did not violate Appellants' due process rights.

■ Appellants argue that Stedino's destruction of the notes shows bad faith. We agree that it does show bad faith as that term is commonly understood, and the jury was fully advised of the games Stedino and Matera played here. But in the context of a due process analysis, the Supreme Court has made clear that "bad faith" has less to do with the actor's intent than with the actor's knowledge that the evidence was "constitutionally material." *Arizona v. Youngblood,* 488 U.S. at 61, 109 S.Ct. at 339; *see also California v. Trombetta,* 467 U.S. 479, 489, 104 S.Ct. 2528, 2534, 81 L.Ed.2d 413 (1984). Evidence is constitutionally material only if its exculpatory value is "apparent."

> First, *Trombetta* speaks of evidence whose exculpatory value is "apparent." 467 U.S. at 489, 104 S.Ct. at 2534. The possibility that the semen samples could have exculpated respondent if preserved or tested is not enough to satisfy the standard of constitutional materiality in *Trombetta.* . . . The presence or absence of bad faith for purposes of the Due Process Clause must necessarily turn on the police's knowledge of the exculpatory value of the evidence at the time it was lost or destroyed. *Cf. Napue v. Illinois,* 360 U.S. 264, 269, 79 S.Ct. 1173, 1177, 3 L.Ed.2d 1217 (1959).

*Arizona v. Youngblood,* 488 U.S. at 56 n. *, 109 S.Ct. at 336 n. *.

*Arizona v. Youngblood* obligated Appellants to demonstrate the constitutional materiality of the notes. As the trial court found, however, the notes did not have exculpatory value; they, "at best, would be impeachment evidence." On appeal Tapp concedes, "[i]t is possible that Stedino, in the notes, took a position consistent with the one he now

no in all matters concerning the Walker/Tapp

takes. . . . And, of course, it is possible that the notes may either help Tapp or hurt him."

*Trombetta* also held that constitutionally material evidence "must be of such a nature that the defendant would be unable to obtain comparable evidence by other reasonably available means." 467 U.S. at 489, 104 S.Ct. at 2534. Appellants made no showing that the notes might have contained information not otherwise available to them. Appellants had lengthy examinations of Stedino and Matera, both before and during trial. Appellants had a copy of the Matera–Stedino book and cross-examined each of them from it.

The trial court correctly concluded that Matera's notes were not "constitutionally material" and that Stedino's destruction of those notes did not violate Appellants' constitutional rights.

### *Willits* Instruction

■ At Appellants' request, the trial court gave a jury instruction based on *State v. Willits,* 96 Ariz. 184, 393 P.2d 274 (1964), regarding Stedino's destruction of Matera's notes. We do not decide that Appellants were entitled to a *Willits* instruction, for that question raises the same "state· actor" difficulties as the due process issue on which we have decided to provide no dicta. We do decide, however, that any error in giving the *Willits* instruction favored Appellants and that there was no error in the language of the instructions given on the issue.

Appellants claim that the trial court erred by refusing to include the following phrase in the *Willits* instruction:

> If you find that the State has lost, destroyed, or failed to preserve evidence whose contents or quality are important to the issues in this case, then you should weigh the explanation, if any, given for the loss or unavailability of the evidence. If you find that any such explanation is inadequate, you may draw an inference unfavorable to the State, *which in itself may create a reasonable doubt as to the defendant's guilt.*

(Emphasis added.) Appellants cite no authority for the argument that this omitted

AZSCAM case."

language is a necessary part of the instruction, and we conclude that the instruction was sufficient without it. *See State v. Tucker,* 157 Ariz. 433, 442–43, 759 P.2d 579, 588–89 (1988) (reaching similar conclusion in case in which defendant challenged sufficiency of *Willits* instruction).

Appellants also claim that the court diluted the *Willits* instruction by following it with the statement:

> However, the State is not compelled to call any particular witness or produce any particular evidence so long as there is fairly presented the material evidence bearing upon the charges for which a defendant is on trial and such evidence establishes the guilt of a defendant beyond a reasonable doubt.

In addressing a similar claim, the supreme court found no error. *See id.* at 443, 759 P.2d at 589 ("On their face the instructions deal with different issues: the production of evidence versus the consequence of destroying evidence.").

## Outrageous Government Conduct

 Tapp's opening brief suggests that the trial court should have dismissed the indictment because Tapp's due process rights were violated by "outrageous government conduct." The State's answering brief includes extensive argument rebutting this suggestion, but Tapp's reply brief advises that the due process issue is implicated only "by analogy." We have considered and rejected the "outrageous government conduct" claim on its merits. Investigation of public corruption often exposes sickening details of both the defendant's abuse of public trust and the government's deception of the defendant. Obviously, if Tapp had not been deceived into thinking that Stedino was what he pretended to be, Tapp would not have committed crimes for the Azscam recording devices. But "government deception" is an issue within the supervisory jurisdiction of the courts only if it violates constitutional rights, and investigatory conduct violates a defendant's due process rights only when it approaches "coercion, violence, or brutality to the person." *Irvine v. California,* 347 U.S. 128, 133, 74 S.Ct. 381, 383, 98 L.Ed. 561

(1954). There was none of that in Azscam. True, Stedino pretended at times to be a mob-connected tough guy, and presumably Tapp thought he had organized crime connections. But there is no evidence that Stedino or anyone else used anything approaching coercion, violence, or brutality on Tapp. As it was in Abscam, so it is in Azscam: the judicial branch of government has no basis for holding that the executive branch violated a defendant's due process rights.

> We may not alter the contours of the entrapment defense under a due process cloak, and we lack authority, where no *specific* constitutional right of the defendant has been violated, to dismiss indictments as an exercise of supervisory power over the conduct of federal law enforcement agents. *See United States v. Payner,* 447 U.S. 727, 737 n. 9 [100 S.Ct. 2439, 2447 n. 9, 65 L.Ed.2d 468] (1980). Precedent dictates that we refrain from applying the general due process constraint to bar a conviction except in the rare instance of "[p]olice overinvolvement in crime" that reaches "a demonstrable level of outrageousness." *Hampton v. United States,* 425 U.S. 484, 495 & n. 7 [96 S.Ct. 1646, 1653 & n. 7, 48 L.Ed.2d 113] (1976) (Powell, J., concurring) (cases "if any," in which a "predisposed" defendant can successfully invoke a due process defense "will be rare"); *United States v. Russell,* 411 U.S. 423, 431–32 [93 S.Ct. 1637, 1642–43, 36 L.Ed.2d 366] (1973).

*United States v. Kelly,* 707 F.2d 1460, 1476–77 (D.C.Cir.1983), *cert. denied,* 464 U.S. 908, 104 S.Ct. 264, 78 L.Ed.2d 247 (1983) (footnotes omitted); *see also United States v. Jenrette,* 744 F.2d 817, 823 (D.C.Cir.1984), *cert. denied,* 471 U.S. 1099, 105 S.Ct. 2321, 85 L.Ed.2d 840 (1985).

## Entrapment

 Tapp claims he was entitled to a judgment of acquittal on the ground that he was entrapped as a matter of law. Before addressing that argument, we summarily reject the State's argument, raised for the first time on appeal, that entrapment is a pre-criminal code defense that no longer exists in Arizona. The defense of entrapment contin-

ues to exist in Arizona. Numerous recent cases discussing the defense can be found at 6 *West's Arizona Digest 2d,* Criminal Law, Key Number 37 (Entrapment).

As a general rule, "[e]ntrapment as a matter of law is established where the defendant raises a substantial and reasonable defense of entrapment which makes it patently clear that he was entrapped, and where the state has done nothing to rebut the defense." *State v. Gessler,* 142 Ariz. 379, 382, 690 P.2d 98, 101 (App.1984) (citations omitted). Entrapment does not exist when state agents "have merely afforded an opportunity for a predisposed person to commit a crime." *Id.* We find no evidence that Tapp was entrapped as a matter of law. This is not a case where the government "supplied all the ingredients of the offense." *State v. Boccelli,* 105 Ariz. 495, 497, 467 P.2d 740, 742 (1970) (entrapment as a matter of law established when state's agents not only induced sale of marijuana, but provided drug, buyer, and money for purchase).

The jury was presented with much evidence that Tapp was predisposed to engage in bribery and related offenses. Tapp's words and deeds are the best evidence against him, and his audio and video taped demeanor strengthens an understanding of his predisposition. In fact, Tapp was often a step ahead of Stedino, as when he announced "I got the quarterback" the day after becoming Stedino's lobbyist and when he bribed a Justice of the Peace without any suggestion from Stedino to do so.

On April 8, 1990, about two weeks after meeting Stedino, Tapp told him in a telephone conversation that their scheme would "cause me to become one of the most powerful motherf___ers in Arizona." He said, "[t]he more I think about it, the more excited I get about it." We find ample support for the verdicts—and for the court's statement to Tapp at sentencing: "Azscam would have foundered if it had not been for you. You claimed you were entrapped. I believe the evidence clearly rebuts that claim. You were an enthusiastic and extremely active participant in this operation."

## Duress

■ The trial court did not err in refusing Tapp's proposed instruction on the defense of duress. That defense is codified in A.R.S. section 13–412 (1989), which states in pertinent part:

A. Conduct which would otherwise constitute an offense is justified if a reasonable person would believe that he was compelled to engage in the proscribed conduct by the threat or use of immediate physical force against his person or the person of another which resulted or could result in serious physical injury which a reasonable person in the situation would not have resisted.

Tapp contends he was entitled to an instruction on duress because of Stedino's testimony that he made representations indicating that he was a Mafia associate, thus implying a capacity for violence. Assuming that such statements qualify as threats, they do not prove duress because they do not show "immediate" coercion, as required by the statute. *See State v. Kinslow,* 165 Ariz. 503, 505, 799 P.2d 844, 846 (1990) (To constitute defense, coercion or duress must be present, imminent, impending, and "of such a nature as to induce a well-grounded apprehension of death or serious bodily injury if the act is not done.") (quoting *State v. Jones,* 119 Ariz. 555, 558, 582 P.2d 645, 648 (App.1978)).

Tapp contends that Stedino unduly influenced or intimidated him during numerous early, unrecorded telephone calls. In light of Tapp's interaction with Stedino on the early calls and visits that were recorded, we find no error in either the trial court's or the jury's rejection of this contention. To rebut Tapp's duress defense, the State moved for permission to introduce evidence of conversations Tapp had with Stedino about having Bartlett murdered. The trial court denied the motion, reasoning that there was no evidence "indicating to any rational person" that Tapp feared Stedino. We agree.

## Illegal Targeting

■ Tapp asserts that he was the victim of "illegal targeting" in violation of his rights to due process and to privacy under the

Fourth Amendment of the U.S. Constitution and Article 2, section 8 of the Arizona Constitution, which states: "No person shall be disturbed in his private affairs, or his home invaded, without authority of law." Tapp suggests that investigators were required to possess "reasonable suspicion" of his readiness to engage in criminal conduct before making any contact with him. Tapp's federal constitutional argument was implicitly rejected in *Jacobson v. United States,* 503 U.S. 540, 549 n. 2, 112 S.Ct. 1535, 1540 n. 2, 118 L.Ed.2d 174 (1992), and has been explicitly rejected in other federal cases involving bribery of public officials. *See, e.g., Jenrette,* 744 F.2d at 823; *United States v. Myers,* 692 F.2d 823, 835 (2d Cir.1982), *cert. denied,* 461 U.S. 961, 103 S.Ct. 2438, 77 L.Ed.2d 1322 (1983).

Article 2, section 8 of the Arizona Constitution is "specific in preserving the sanctity of homes and in creating a right of privacy." *State v. Bolt,* 142 Ariz. 260, 264–65, 689 P.2d 519, 523–24 (1984). Tapp makes no assertion that the sanctity of his home was violated, and he fails to explain in what other way the Azscam investigation might have offended a right of privacy created by Article 2, section 8.

### Entrapment Instruction

■ Tapp's proposed instruction on entrapment varied from the one given by the trial court in only one respect: it required the State to prove that "[t]he defendant was predisposed to commit the type of crime charged before any State contact or inducement." Tapp argues that this additional element is required by *Jacobson,* 503 U.S. at 549, 112 S.Ct. at 1540, a federal prosecution for receipt of material depicting minors engaged in sexual conduct. We disagree. The focus in *Jacobson* was on the extraordinary efforts by postal inspectors to induce the defendant to order prohibited items through the mail. The Supreme Court held that the defendant was entrapped as a matter of law because "[t]he evidence that petitioner was ready and willing to commit the offense came only after the Government had devoted 2½ years to convincing him that he had or should have the right to engage in the very

behavior proscribed by law." *Id.* at 553, 112 S.Ct. at 1543.

Tapp's argument that *Jacobson* added a new element to entrapment law was disclaimed by the *Jacobson* majority. *Id.* at 549 n. 2, 112 S.Ct. at 1540 n. 2 ("The dissent is mistaken in claiming that this is an innovation in entrapment law and in suggesting that the Government's conduct prior to the moment of solicitation is irrelevant.").

Although we conclude that *Jacobson* did not add a new element to the entrapment defense, even if we assumed that it did, we would find no trial court error here. *Jacobson* did not announce a rule of constitutional dimension, *Rivera v. State,* 846 P.2d 1, 4 n. 2 (Wyo.1993), and federal entrapment law has not been controlling in Arizona. *State v. Soule,* 168 Ariz. 134, 135, 811 P.2d 1071, 1072 (1991), *cert. denied,* 502 U.S. 1038, 112 S.Ct. 888, 116 L.Ed.2d 791 (1992). We conclude that the trial court's entrapment instruction correctly stated Arizona law. *See State v. Apodaca,* 166 Ariz. 274, 277, 801 P.2d 1177, 1180 (App.1990) (approving an instruction similar to the one given here).

### Hannah Priors

■ The State added several years to Tapp's prison sentences by invoking former A.R.S. section 13–604(H) (1989) and alleging that some counts in this case were prior convictions of others. Tapp argues that the statute is void for vagueness because it is susceptible to a construction different from that reached by our supreme court in *State v. Hannah,* 126 Ariz. 575, 576, 617 P.2d 527, 528 (1980). Such susceptibility means only that the statute needed interpretation, not that it was unconstitutionally vague. *See State v. Takacs,* 169 Ariz. 392, 395, 819 P.2d 978, 981 (App.1991).

Tapp argues that the statute violates the separation of powers guarantee of Article 3 of the Arizona Constitution by giving sentencing power to the prosecutor. This argument has been rejected by the Arizona Supreme Court. *State v. Prentiss,* 163 Ariz. 81, 85, 786 P.2d 932, 936 (1989) (executive branch has power to enhance punishment); *see also State v. Olsen,* 157 Ariz. 603, 607, 760 P.2d

603, 607 (App.1988) (upholding mandatory sentencing statutes).

### Entrapment: Admitting the Elements

██ Walker argues that the trial court erred in failing to instruct the jury on her defense of entrapment. Because Walker did not admit the elements of the crimes with which she was charged, she was not entitled to an entrapment instruction. The Arizona Supreme Court still requires that a defendant asserting the entrapment defense admit the elements of the crimes with which she is charged. *See Soule*, 168 Ariz. at 135, 811 P.2d at 1072 ("Requiring a trial court to entertain an entrapment defense when the defendant has not admitted all the elements of the crime does not serve the cause of criminal justice."). As counsel recognize, we cannot overturn a decision of the Arizona Supreme Court. *State v. McShine*, 131 Ariz. 485, 487, 642 P.2d 482, 484 (App.1982).

### Bribery: Corrupt Intent

██ The bribery statute, A.R.S. section 13–2602 (1989), provides:

A. A person commits bribery of a public servant or party officer if with corrupt intent:

1. Such person offers, confers or agrees to confer any benefit upon a public servant or party officer with the intent to influence the public servant's or party officer's vote, opinion, judgment, exercise of discretion or other action in his official capacity as a public servant or party officer; or

2. While a public servant or party officer, such person solicits, accepts or agrees to accept any benefit upon an agreement or understanding that his vote, opinion, judgment, exercise of discretion or other action as a public servant or party officer may thereby be influenced.

The jury instructions defined "intent" but did not define "corrupt intent." After several days of deliberations, the jury requested a definition of "corrupt intent." The trial court consulted with counsel and then gave the jury the following supplemental instruction, over Walker's objection:

Intent is defined for you at page 5, lines 6–10 [of the instructions]. Corrupt in the context of the charge of bribery means dishonest and being open to bribery or using a position of trust for dishonest gain. . . .

Walker finds error in this definition but we do not. Although no Arizona statute defines "corrupt intent," A.R.S. section 1–215(5) (1989) comes close; it defines "corruptly" as "import[ing] a wrongful design to acquire or cause some pecuniary or other advantage to the person guilty of the act or omission referred to, or to some other person."

The definitions within A.R.S. section 1–215 apply to "the statutes and laws of the state, unless the context otherwise requires." We find that "corruptly" means about the same as "with corrupt intent." Indeed, A.R.S. section 13–2605 (1989), which defines "commercial bribery," uses "corruptly" rather than "with corrupt intent" to describe the requisite mental state for that offense.

The court instructed the jury that the instructions were to be considered as a whole. Considered in that light, we agree that the new instruction might have assisted the jury to glean a meaning of "corrupt intent" consistent with the meaning of "corruptly." *See State v. McNair*, 141 Ariz. 475, 481, 687 P.2d 1230, 1236 (1984) (supplemental jury instruction is evaluated in light of all instructions and will constitute error only if it contradicts "true rule of law" and misleads the jury on a material point).

The trial court properly rejected Walker's proposed definition of "corrupt intent," which would have required the State to prove "that the benefit received by a public servant was the prime mover or producer of the official act." Drawing on federal cases discussing the distinction between bribery, which requires the defendant to act "corruptly," and receipt of an illegal gratuity, which does not, Walker asserts that her proposed instruction was necessary to draw a similar distinction between the Arizona offenses of bribery and asking for or receiving an illegal gratuity. *See* A.R.S. § 38–444 (1985); *United States v. Strand*, 574 F.2d 993, 995–96 (9th Cir.1978); *United States v. Brewster*, 506 F.2d 62, 64

(D.C.Cir.1974). We note that *Strand* found no error in instructions that defined "corruptly" in terms similar to the definition found in A.R.S. section 1–215. 574 F.2d at 996; *accord, United States v. Dorri,* 15 F.3d 888, 890–92 (9th Cir.), *cert. denied,* —— U.S. ——, 115 S.Ct. 521, 130 L.Ed.2d 426 (1994).

### Mid–Deliberation Instruction

◼◼◼ We also disagree with Walker's claim that the trial court erred by giving the "corrupt intent" instruction during jury deliberations without allowing counsel to make additional argument to the jury. The trial court has the discretion to give "appropriate additional instructions" to the jury upon request. Ariz.R.Crim.P. 22.3; *State v. Ramirez,* 178 Ariz. 116, 126, 871 P.2d 237, 247, *cert. denied,* —— U.S. ——, 115 S.Ct. 435, 130 L.Ed.2d 347 (1994). When a jury is "confused about a legal issue, and the resolution of the question is not apparent from an earlier instruction, the trial judge has a 'responsibility to give the jury the required guidance by a lucid statement of the relevant legal criteria.'" *Id.* (quoting *Des Jardins v. State,* 551 P.2d 181, 190 (Alaska 1976), and *Bollenbach v. United States,* 326 U.S. 607, 612–13, 66 S.Ct. 402, 405–06, 90 L.Ed. 350 (1946)).

Walker asserts that reversible error may occur when a court delivers a supplemental instruction without allowing the defendant to argue its significance to the jury. *See United States v. Gaskins,* 849 F.2d 454, 458 (9th Cir.1988); *United States v. Oliver,* 766 F.2d 252, 254 (6th Cir.1985). Those cases, however, turned on the existence of prejudice caused by the new instruction. *See, e.g., United States v. Horton,* 921 F.2d 540, 547 (4th Cir.1990), *cert. denied,* 501 U.S. 1234, 111 S.Ct. 2860, 115 L.Ed.2d 1027 (1991); *United States v. Civelli,* 883 F.2d 191, 196 (2d Cir.), *cert. denied,* 493 U.S. 966, 110 S.Ct. 409, 107 L.Ed.2d 374 (1989); *United States v. Burgess,* 691 F.2d 1146, 1156 (4th Cir.1982).

Walker's counsel argued to the jury that she was not guilty of bribery because she had never committed her vote for the purpose of a financial reward, an argument that was not prejudiced by the new instruction. *See Horton,* 921 F.2d at 547 (additional closing argument not required when all points essential to defendant's case were made in initial closing argument).

Furthermore, the "corrupt intent" issue related to charges on which Walker was not convicted.

### Inaudible Recordings

◼◼◼ Walker contends that the trial court erred in denying her motion to preclude five videotapes that were at times inaudible. "Whether a recording is sufficiently audible to be admitted into evidence is within the sound discretion of the trial court." *State v. Dante,* 25 Ariz.App. 150, 154, 541 P.2d 941, 945 (1975), *cert. denied,* 429 U.S. 853, 97 S.Ct. 146, 50 L.Ed.2d 128 (1976), *overruled on other grounds by State v. Hunter,* 136 Ariz. 45, 50, 664 P.2d 195, 200 (1983); *see also State v. Kennedy,* 122 Ariz. 22, 27, 592 P.2d 1288, 1293 (App.1979). Unless the inaudible portions are so substantial as to render the entire recording untrustworthy, the tape is admissible. *Dante,* 25 Ariz.App. at 154, 541 P.2d at 945. *Dante* states the general rule of admissibility of such evidence. *See* Daniel Feld, *Annotation: Omission or Inaudibility of Portions of Sound Recording as Affecting its Admissibility in Evidence,* 57 A.L.R.3d 746, 752 (1974 and Supp.1994).

We have reviewed the tapes and find no abuse of discretion in their admission. There are inaudible portions, mostly when Walker is speaking, but they are intermittent, inconsequential, and do not render the recording untrustworthy.

Walker also argues that the trial court erred in refusing a *Willits* instruction on this issue, reasoning that an audio engineer testified that the "automatic gain control" of the State's microphones contributed to poor sound quality, and better equipment was available. That the State might not have used state of the art equipment during Azscam is no reason for a *Willits* instruction.

### Consent Surveillance

◼◼◼ Walker argues that recording her conversations with Stedino violated her state constitutional right to privacy. *See* Ariz. Const. art. 2, § 8. This kind of recording—called "participant monitoring" or "consent

surveillance" because it is with the consent of one of the participants—is authorized by A.R.S. section 13–3012(9) (Supp.1995). In *State v. Allgood*, 171 Ariz. 522, 524, 831 P.2d 1290, 1292 (App.1992), we held that this practice did not violate the state constitution. This result is consistent with the Fourth Amendment, *see United States v. Caceres*, 440 U.S. 741, 750, 99 S.Ct. 1465, 1471, 59 L.Ed.2d 733 (1979), and nearly all decisions from other states regarding their own constitutions. Carr, *The Law of Electronic Surveillance*, § 3.5(a)(3) at 3–67 (2d ed. 1991).

### Stedino "Turn Downs"

■ Walker contends that the trial court erred by denying her motion to preclude evidence of legislators who met with Stedino but turned down his cash offers. Asserting that the relevance of this evidence is questionable, Walker argues that it was also unfairly prejudicial because it invited the jury to compare her conduct to that of others. *See* Ariz.R.Evid. 403.

■ Whether the probative value of relevant evidence is substantially outweighed by the danger of unfair prejudice is a matter committed to the sound discretion of the trial court. *State v. Clabourne*, 142 Ariz. 335, 343, 690 P.2d 54, 62 (1984). We find no abuse of discretion in allowing the jury to see that not every legislator who talked to Stedino accepted cash from him. This evidence had arguable relevance to the entrapment defense which, at the time the court ruled on this motion, appeared to be Walker's main defense. Not until her end-of-trial refusal to comply with *Soule* did Walker theoretically abandon her entrapment defense.

This claim of error also relates only to charges on which Walker was not convicted, the bribery charges.

### Jury Misconduct

■ Tapp claims that the trial court erred in denying a motion for mistrial based on jury misconduct. The facts supporting this motion came to light in September 1992—about five months into the trial—when a juror notified the court that other jurors had complained of the slow pace of Walker's cross-examination of Stedino. The juror also expressed concern that other jurors were not keeping an open mind. The trial court promptly examined all sixteen jurors and alternates in chambers. Several reported that other jurors had been reading news accounts of the trial or had expressed opinions about Appellants' guilt. Several said that juror W.S. had admitted reading newspapers. Two reported that they had heard people at work express opinions about Appellants' guilt. The court excused juror W.S. for cause and denied the motion for mistrial. The court later designated as an alternate a juror who allegedly had expressed an opinion on Appellants' guilt, and this juror did not participate in deliberations.

■ Tapp argues that he was entitled to a mistrial because the jury was "tainted by preconceived notions of guilt" and considered matters not in evidence. We review the trial court's denial of a mistrial motion for an abuse of discretion. *State v. Bible*, 175 Ariz. 549, 598, 858 P.2d 1152, 1201 (1993), *cert. denied*, —— U.S. ——, 114 S.Ct. 1578, 128 L.Ed.2d 221 (1994).

By examining the individual jurors, the trial court had the benefit of assessing their demeanor and answers, and the jurors had the benefit of assessing the trial court's demeanor and questions. The jurors swore that they had not been influenced by misconduct of others and that they could fairly and impartially decide the case. The record reflects that the trial court took timely and appropriate action to resolve the concerns of some jurors and correct the mistakes of others. If this were a short and simple trial, perhaps the court might have taken different action. Considering the length and complexity of this trial, however, and the timing and nature of the problem and the curative efforts of the trial court, we conclude that the court did not abuse its discretion in finding that the reconstituted jury was able to overcome any mistakes and could be depended upon to keep an open mind and decide the case based on the evidence and the law.

Any concern about the integrity of this jury was dispelled by its lengthy deliberations and the split verdicts. The record reflects a hard-working jury that thoroughly considered the evidence and the instructions. This jury deliberated from October 7 to No-

vember 5 and frequently sent out written questions that reflected considerable attention to detail. For example, on October 8 the jury asked, "Our understanding is that Carolyn Walker cannot be found guilty of money laundering if she is not found guilty of the accompanying bribery charge? Is this correct?" On October 9 the jury asked for a definition of "corrupt intent." On October 14 the jury asked, "Do we have to determine whether Mr. Tapp was entrapped on each individual charge?" On October 19 the jury asked, "Is Mr. Tapp guilty of bribery if he knew that some legislators were bribed by others even if he wasn't present or didn't give the person money himself?"

On November 5 the jury returned fourteen guilty verdicts, nine not guilty verdicts, and a deadlock on eight counts. Considering the audio and video taped evidence, it appears obvious that the jury, at a minimum, gave both Appellants the benefit of an open mind and every reasonable doubt. This conclusion is particularly apparent regarding Tapp, who complied with *Soule* and admitted the elements of all twenty-three counts against him—and the jury found him guilty of only twelve of those counts.

The convictions and sentences are in all respects affirmed.

GRANT and McGREGOR, JJ., concur.