IN THE

# SUPREME COURT OF THE STATE OF ARIZONA

STATE OF ARIZONA,
*Appellee*,

*v.*

BRYAN WAYNE HULSEY,
*Appellant*.

No. CR-14-0291-AP
Filed January 18, 2018

Appeal from the Superior Court in Maricopa County
The Honorable Joseph C. Kreamer, Judge
No. CR2007-111635
**AFFIRMED IN PART, REVERSED IN PART AND REMANDED**

COUNSEL:

Mark Brnovich, Arizona Attorney General, Dominic Draye, Solicitor General, Lacey Stover Gard, Chief Counsel, Kristina Reeves (argued), Assistant Attorney General, Capital Litigation Section, Phoenix, Attorneys for State of Arizona

David Goldberg, Esq. (argued), Fort Collins, CO; Thomas A. Gorman, Attorney at Law, Sedona, Attorneys for Bryan Wayne Hulsey

---

JUSTICE BOLICK authored the opinion of the Court, in which CHIEF JUSTICE BALES, VICE CHIEF JUSTICE PELANDER, JUSTICES BRUTINEL, TIMMER, GOULD, and BERCH (RETIRED)* joined.

---

JUSTICE BOLICK, opinion of the Court:

¶1        Bryan Wayne Hulsey was sentenced to death after a jury found him guilty of the first degree murder of an on duty peace officer. Hulsey also received a consecutive nine-year sentence for his conviction of attempted first degree murder of another on duty peace officer. This Court has jurisdiction over this automatic appeal under article 6, section 5(3) of the Arizona Constitution and A.R.S. §§ 13-4031, -4033(A). We affirm Hulsey's convictions and prison sentence, but, consistent with *Lynch v. Arizona* (*Lynch III*), 136 S. Ct. 1818 (2016), vacate his death sentence and remand for new penalty phase proceedings.

## BACKGROUND

¶2        On the morning of February 19, 2007, Hulsey was the front-seat passenger in a car that police pulled over in a routine traffic stop in Glendale. Officer David Goitia, who initiated the traffic stop, asked the three occupants for identification. As Officer Goitia took the identifications back to his police cruiser, Officer Anthony Holly walked over to the passenger side of the car.

¶3        After determining that both the driver and backseat passenger had outstanding warrants, Officer Goitia arrested the driver and placed her in his police car. He then approached Hulsey and asked about

---

* Justice John R. Lopez IV recused himself from this case. Pursuant to article 6, section 3 of the Arizona Constitution, the Honorable Rebecca White Berch, Justice of the Arizona Supreme Court (Retired), was designated to sit in this matter.

the identification Hulsey had provided. Hulsey immediately became agitated, and Officer Goitia told him to get out of the car so that he could pat Hulsey down for weapons for the officers' safety.

¶4        Hulsey stepped out of the car and as the pat-down commenced, he took a step back, reached into his waistband, and pulled out a gun. Hulsey aimed at the officers and started firing. Hulsey and Officer Goitia exchanged gunfire as the officer ran for cover and Hulsey ran from the scene. Hulsey made it around the street corner but was soon surrounded by responding officers and arrested. Officer Holly died of a gunshot wound to the head.

¶5        Hulsey was charged with first degree murder of a law enforcement officer, attempted murder of a law enforcement officer, and misconduct involving weapons. The State sought the death penalty. Before trial, the court granted Hulsey's motion to sever the weapons charge.

¶6        At trial, the State presented testimony from both Officer Goitia and the back-seat passenger to establish that Hulsey shot Officer Holly. Hulsey's primary defense was that Officer Holly had been accidentally shot and killed by Officer Goitia.

¶7        Hulsey presented data from "Shot Spotter," a system designed to pick up the sound of gunfire. Hulsey used this data to attempt to show that he fired only one shot that morning. He argued that the investigation produced only one bullet from his gun at the scene, which contained no visible blood. Hulsey used the Shot Spotter data to support his contention that he did not fire his weapon near the cars, but Officer Goitia saw it in his waistband and panicked. Hulsey argued that Officer Goitia ran to the police vehicle to take a position of cover and fired the first ten shots at Hulsey. Hulsey claims he then ran and, while running away, he turned and fired a single shot in Officer Holly's direction.

¶8        The jury found Hulsey guilty on both counts and that the State had proven two aggravating factors justifying a death sentence: that Hulsey was previously convicted of  a serious offense, A.R.S. § 13-751(F)(2), and that Officer Holly was an on duty peace officer killed  in

3

the course of his official duties, A.R.S. § 13-751(F)(10). After considering mitigation evidence, the jury found a death sentence appropriate and the court imposed that sentence and a consecutive nine-year sentence for the attempted first degree murder conviction.

## DISCUSSION

### I. Pretrial Issues

#### A. Destruction of evidence

¶9   An x-ray taken during Officer Holly's autopsy revealed a few scattered bullet fragments in his skull. The medical examiner, Dr. John Hu, did not to recover the fragments because he thought they were too small to have forensic value and doing so would "leave significant mutilation or disfiguring of Mr. Holly's face." Officer Holly's remains were later cremated. At trial, the court gave a *Willits* instruction, *State v. Willits*, 96 Ariz. 184, 191 (1964), allowing the jury to infer that the destroyed fragments were not from Hulsey's gun.

¶10   Hulsey claims that the failure to extract and preserve bullet fragments deprived him of due process because they would have conclusively proved his innocence. Only two guns were deployed that morning: Officer Goitia's .40-caliber Glock with hollow point rounds and Hulsey's .357 magnum with jacketed soft point ammunition. If the bullet that killed Officer Holly did not come from Hulsey's gun, he would not be guilty of the death-qualifying charge. *See* A.R.S. § 13-203(A)(1) (defendant's conduct must be the cause-in-fact). For the following reasons, we conclude that the trial court did not abuse its discretion in denying Hulsey's motions related to the alleged destruction of evidence.

##### 1. Motion to exhume

¶11   Hulsey moved early in the case to exhume Officer Holly's body to retrieve the bullet fragments. The State opposed the motion as moot, stating that Officer Holly's body had been cremated. Acknowledging there was no body to exhume, Hulsey withdrew his request for oral argument on the matter, yet did not withdraw his motion. The trial court

denied the motion "under [the] circumstances." We review a denial of a motion to exhume for abuse of discretion. *State v. Atwood*, 171 Ariz. 576, 604–05 (1992), *disapproved on other grounds by State v. Nordstrom*, 200 Ariz. 229, 241 ¶ 25 (2001).

¶12 Hulsey never requested access to the cremated remains. Hulsey's motion to exhume applied only to the physical body. In response to his original motion to exhume, Hulsey was informed of the cremation, to which he responded that the "logic seems clear" that the body cannot be exhumed. Although never withdrawing the motion to exhume, Hulsey conceded that "the answer to the issue of exhumation seems clear." In his reply, Hulsey stated that issues generated from the cremation existed, but that those issues would "be raised by the defense in future motions—not in the present motion." However, Hulsey filed no motion concerning access to the cremated remains.

¶13 Even if the motion to exhume applied to the cremated remains, the trial court did not abuse its discretion in denying it. "Exhumation of the victim's body is to be allowed only under extraordinary circumstances. Where existence of the evidence sought was so speculative and uncertain, and its value in aiding defendant's defense so conjectural and remote, the trial court properly exercised its discretion in refusing appellant's motion." *Atwood*, 171 Ariz. at 604–05 (quoting *Commonwealth v. Kivlin*, 406 A.2d 799, 805 (Pa. 1979)).

¶14 This case is much like *Atwood*, in which the defense presented only "cryptic promises" that relevant evidence could be discovered. *Id.* at 604. When the trial court ruled on Hulsey's claim, the notion that any fragments in the remains still held evidentiary value was unsubstantiated. Even today Hulsey concedes on appeal that "the record is silent as to whether the fragments in fact still exist in the decedent's remains." Thus, even if the motion to exhume applied to the cremated remains, the prospect that analysis of the remains would aid Hulsey's defense is speculative. Denial of the motion to exhume was not an abuse of discretion.

¶15 Hulsey also requests this Court to stay his appeal and "remand the case for resolution of [the] factual issue" of whether the

fragments were destroyed. Hulsey waived his right to an evidentiary hearing by conceding that the evidence was destroyed in his two motions to dismiss for bad faith destruction of evidence and only now requesting access to the remains. *See State v. Gutierrez*, 229 Ariz. 573, 579 ¶ 32 (2012) ("[W]hen there are no material facts in dispute and the only issue is the legal consequence of undisputed material facts, the superior court need not hold an evidentiary hearing."); *see also State v. Trostle*, 191 Ariz. 4, 13 (1997) (finding failure to request evidentiary hearing about juror misconduct at trial waived on appeal). The State avowed in response to the first motion to exhume that the body was unavailable for inspection because the body had been cremated. Furthermore, Hulsey has given this Court no reason to assume the fragments still exist.

### 2. Motion to dismiss

**¶16** After it was revealed that Officer Holly was cremated, Hulsey moved to dismiss the charges for bad faith destruction of evidence. The trial court concluded that there was insufficient evidence of bad faith on the State's part. However, one year later, Hulsey renewed his motion to dismiss in light of new evidence—an affidavit from a firearms expert—purporting to show bad faith destruction of the bullet fragments. The court denied the motion, stating that bad faith was not demonstrated.

**¶17** Hulsey argues that the trial court abused its discretion in denying the motions to dismiss. Specifically, he alleges that the trial court erred by (1) applying a too-narrow standard based on *Youngblood* and thereby overlooking *Trombetta*'s import, *see Arizona v. Youngblood*, 488 U.S. 51, 58 (1988); *California v. Trombetta*, 467 U.S. 479, 488–89 (1984); (2) twice denying a request to hold an evidentiary hearing; and (3) ruling on a record that showed the fragments were constitutionally material and sufficient evidence of bad faith. A trial court's denial of a motion to dismiss an indictment is reviewed for abuse of discretion. *State v. Matlock*, 109 Ariz. 193, 195 (1973). We defer to a trial court's findings of fact when they are supported by the record and not clearly erroneous, *Shooter v. Farmer*, 235 Ariz. 199, 200 ¶ 4 (2014), but review legal conclusions de novo. *State v. Newell*, 212 Ariz. 389, 397 ¶ 27 (2006). The trial court did not err in denying the motions to dismiss.

### a. Destruction of evidence standard

¶18       In order for a state to have a constitutional duty to preserve evidence, the "evidence must both possess an exculpatory value that was apparent before the evidence was destroyed, and be of such a nature that the defendant would be unable to obtain comparable evidence by other reasonably available means." *Trombetta*, 467 U.S. at 488–89; *see also United States v. Agurs*, 427 U.S. 97, 112 (1976) ("[I]f the omitted evidence creates a reasonable doubt that did not otherwise exist, constitutional error has been committed.  This means that the omission must be evaluated in the context of the entire record.").  On the other hand, where the evidence is only "potentially useful," a defendant must show bad faith on the part of the police for the destruction of evidence to violate due process.  *Illinois v. Fisher*, 540 U.S. 544, 547–48 (2004) (quoting *Youngblood*, 488 U.S. at 58); *see also State v. Goudeau*, 239 Ariz. 421, 442 ¶ 44 (2016).

¶19       Hulsey argues that when evidence is "constitutionally material," "even in the absence of proof of bad faith[,] a defendant is entitled to relief under the Due Process Clause where the destroyed evidence is *probably* or *likely* exculpatory rather than in *Youngblood* only potentially exculpatory."  This is incorrect.  We have held that "the same bad-faith test applies to identify violations of either the Arizona due process clause or the federal due process clause."  *State v. Glissendorf*, 235 Ariz. 147, 151 ¶ 14 (2014).  The court here applied the proper standard.

¶20       Hulsey alternatively requests that this Court reconsider the scope of the bad faith requirement under due process mandates in our state constitution.  We decline to do so.  Our application of both *Youngblood* and *Trombetta* adequately encompasses fundamental fairness required by our state constitution whether the evidence is material and exculpatory or only potentially exculpatory.

### b. Requests for evidentiary hearing

¶21       Hulsey argues that the trial court abused its discretion by twice refusing to hold an evidentiary hearing on his motions to dismiss for bad faith destruction thereby "preclud[ing] this Court [from] . . .

meaningfully review[ing] its resolution of fact intensive issues." A failure to hold an evidentiary hearing is reviewed for abuse of discretion. *State v. Spears*, 184 Ariz. 277, 289 (1996). We conclude that neither denial of the requests for evidentiary hearings was error.

¶22 At oral argument on the first motion to dismiss for bad faith destruction of evidence, the trial court concluded that Hulsey failed to show that, at the time of the destruction, the State believed the fragments had evidentiary value. The defense argued that the medical examiner allegedly disobeyed clear protocol when he saw the fragments on the x-ray and did not retrieve them; instead, the medical examiner asked Detective Bustoz whether he should gather them and the detective purportedly told him "no."[1] The court found that the lack of apparent evidentiary value at the time of destruction militated against finding the State acted in bad faith.[2]

¶23 Trial courts have broad discretion in determining whether an evidentiary hearing is required, but "should err on the side of granting an evidentiary hearing so that they can gather as much relevant information as possible before making their rulings." *Id.* Apart from an uncontested claim that the medical examiner may not have followed proper protocol—

---

[1] At trial, Detective Bustoz denied making the decision not to preserve the bullet fragments, and Dr. Hu could not recall any such statement by Detective Bustoz.

[2] Hulsey claimed at trial that bad faith was shown when the medical examiner saw the fragments but did not retrieve them at Detective Bustoz's directive. Regardless whether such a directive occurred, we note that Dr. Hu explained that the fragments were too tiny to extract and too difficult to find without mutilation. There was also no bad faith in Detective Bustoz describing his understanding of the circumstances of the shooting to the doctor. Dr. Hu stated that it was common practice for the homicide detective to be present at the examiner's office and that the information he received was that "the suspect produced a gun, fired a couple shots and Officer Holly received a gunshot wound."

that is, to "recover foreign bodies of evidentiary value"—the defense failed to present any evidence that would show bad faith as required by *Youngblood*. *State v. Walker*, 185 Ariz. 228, 238 (App. 1995) ("[B]ad faith has less to do with the actor's intent than with the actor's knowledge that the evidence was constitutionally material." (internal quotation marks omitted) (citing *Youngblood*, 488 U.S. at 61)). Nothing alerted Detective Bustoz or Dr. Hu that Hulsey would allege that Officer Goitia shot Officer Holly. Because at worst the failure to extract the fragments only amounted to negligence, the court did not abuse its discretion in not granting an evidentiary hearing.

¶24        When Hulsey renewed his motion, he claimed that he could "now affirmatively demonstrate that he has been prejudiced by the bad faith actions of the State." The pertinent addition from the first motion was an affidavit from Jaco Swanepoel, Hulsey's firearms expert. Swanepoel declared that "no piece of forensic evidence . . . should arbitrarily be left unrecovered. . . . Fragments should be recovered for examination, irrespective of size." Hulsey argued that bad faith was established when the "experienced prosecutor, experienced homicide detective and the medical examiner all recognized the constitutional materiality of the bullet fragments left within the victim's head, yet they intentionally failed to preserve the evidence."

¶25        The trial court agreed that it was reasonable to assume that fragments could be used to establish the identity of the weapon, but remained convinced that it was "merely potentially exculpatory at best." We agree. It is not clear to us now, nor was it clear to the trial court at the time, that the fragments would definitively confirm Hulsey's theory. When he renewed the motion, Hulsey's only new basis for his argument that the trial court abused its discretion by failing to hold an evidentiary hearing was Swanepoel's affidavit, which addressed harm rather than bad faith and therefore did not support an evidentiary hearing. *Cf. State v. Grounds*, 128 Ariz. 14, 15 (1981) (explaining that because the record was "devoid of evidence," there was nothing upon which the trial court could base its ruling). Therefore, the evidence was only potentially exculpatory and Hulsey provided no new reason for granting an evidentiary hearing. The court's refusal to grant an evidentiary hearing was not an abuse of discretion.

c. Motions to dismiss

**¶26** At trial, Hulsey also argued that the case should have been dismissed because the State acted in bad faith by not preserving bullet fragments. As discussed previously, *supra* ¶¶ 18–19, because its exculpatory value was not readily apparent, Hulsey cannot show bad faith on the State's part in not preserving the evidence. The trial court therefore did not abuse its discretion in ruling that the destruction of the bullet fragments did not violate due process. *See Fisher*, 540 U.S. at 549 (applying *Youngblood* bad faith requirement when destroyed evidence was only potentially useful).

**¶27** Hulsey also claimed that the State acted in bad faith in releasing Officer Holly's body to his family without first notifying the defense and by the examiner violating internal protocol to "recover foreign bodies of evidentiary value." *See* Ariz. R. Crim. P. 28.2(e). Releasing a victim's body to the family does not in itself show bad faith. *See Lopez v. State*, 86 P.3d 851, 862 (Wyo. 2004). Moreover, Hulsey's cited authority for the State's purported duty to notify the defense pursuant to Rule 28.2(e) applies to "post-verdict proceedings" and does not apply in pretrial discovery. *State v. Superior Court*, 127 Ariz. 175, 177 (1980) ("Rule 28.2 [is] therefore irrelevant to defendant's pretrial motion for discovery or in the alternative to suppress."). Furthermore, the allegation that the medical examiner failed to follow internal policies is without merit. The medical examiner testified that he did not attempt to recover the fragments because he believed "they are likely to have no forensic value." That is, the medical examiner was following internal protocol because he is not required to recover foreign bodies that he does not believe have evidentiary value.

**¶28** At trial, Hulsey cross-examined the medical examiner and asked detailed questions to Detective Bustoz about the autopsy and why the fragments were not obtained. At Hulsey's request, the jury was given a *Willits* instruction telling the jury it could draw a negative inference against the State for failing to preserve the evidence, thereby mitigating any prejudice. The trial court did not abuse its discretion in denying the motion to dismiss for bad faith destruction of evidence.

### B. Refusal to compel witness to testify

**¶29**        Hulsey argues that the trial court erred when it refused to compel the driver of the car, Giota "Niki" Kostas, to testify.  Under the Sixth Amendment, a defendant may compel a witness to testify, but that "right is not absolute and will give way when the witness's preservation of his own Fifth Amendment rights would prevent him from answering relevant questions."  *State v. Martinez*, 218 Ariz. 421, 428 ¶ 26 (2008) (internal quotation marks and citation omitted).  Hulsey claims that the trial court erred by basing its decision on the nonexistent doctrine of anticipatory perjury.  We review a denial of a motion to compel for abuse of discretion. *Id.* ¶ 25.

**¶30**        Before trial, Kostas, believing she may have criminal culpability related to the shooting, requested a lawyer when defense counsel attempted to interview her.  At a case management conference, where Hulsey sought to elicit information from Kostas, Kostas' attorney stated that he would advise Kostas to invoke the privilege "if my client's understanding of or recollection is any different from that audio and video recorded interview."  He avowed that "if [Kostas] were directed to answer those questions to the best of her recollection, . . . it could possibly be in contradiction to perhaps what the state has on audio or video, and for that reason, I believe my client could be exposed to potential charges, new charges . . . ."  The trial court allowed Kostas to assert her Fifth Amendment privilege, determining that Kostas had reasonable grounds to apprehend prosecution and so she could invoke her Fifth Amendment privilege.

**¶31**        Hulsey claims that the trial court ruling was based on "anticipatory" perjury because it was premised on Kostas potentially giving testimony at trial that differed from her previous statements.  The trial court's ruling reflects that Kostas could still be charged with a crime that either had not been charged yet or does not have a statute of limitations.  Because the trial court properly concluded that Kostas had reasonable grounds to fear criminal prosecution based on her testimony, the court did not abuse its discretion by not compelling Kostas to testify.

### C. Striking Juror 123 for cause

**¶32**        Hulsey argues that the trial court erred in striking Juror 123 from the venire for his views on the death penalty. *See State v. Anderson*, 210 Ariz. 327, 337–38 ¶¶ 25–26 (2005) ("The Sixth Amendment forbids excusing potential jurors for cause solely because of their general objections to the death penalty." (citing *Witherspoon v. Illinois*, 391 U.S. 510, 522 (1968))).   Potential jurors should be excluded if, after questioning on whether they can set aside their personal views, the jurors would remain unwilling or unable to perform their duty or follow the judge's instructions. *See id.*   A trial court's decision to strike a juror for cause is reviewed for abuse of discretion. *State v. Burns*, 237 Ariz. 1, 13 ¶ 22 (2015).

**¶33**        During voir dire, Juror 123 gave inconsistent answers to questions regarding his feelings about the death penalty.   In the juror questionnaire, Juror 123 stated that even if a person killed someone, he should never be sentenced to death.  But Juror 123 selected "no" to whether his views against the death penalty were so strongly held that he would be prevented or substantially impaired from performing his duty as a juror. However, he also marked on the questionnaire that he would not be able to enter the verdict of death after hearing all the evidence.

**¶34**        When examined by the defense, Juror 123 said he did not believe in the death penalty.  After further questioning he wavered slightly, stating that, "I guess it's on the table," and that he "could possibly change [his] mind."  He finally concluded that he might change his mind if he was backed up against a wall or able to debate the issue.   When the State questioned Juror 123 about his inconsistent answers, he confessed that he was confused.  He explained that his unequivocal "no" to whether he could enter a verdict of death was incorrect, but that he would not sentence someone to death even if the person killed another.

**¶35**        The court concluded that the answers to the questionnaire indicating Juror 123 would not sentence someone to death were "crystal clear."  The court also ruled that, based on its observation, Juror 123's views on the death penalty would substantially impair his performance as a juror.

¶36　　　This was not a scenario in which a juror expressed only "general objections to the death penalty." *Witherspoon*, 391 U.S. at 522 (prohibiting exclusion for general objections, or expressed conscientious or religious scruples against death penalty). The juror questionnaire showed that Juror 123 would not be able to render a death sentence. *See Burns*, 237 Ariz. at 13 ¶ 23 ("A potential juror need not object to the death penalty in every possible case to warrant a dismissal for cause."); *State v. Garcia*, 224 Ariz. 1, 9 ¶¶ 18–19 (2010) (finding no error in striking juror who was conflicted about imposing the death penalty). Juror 123's inconsistent responses to follow-up questions did not assuage the trial court's concern that his views of the death penalty would substantially impair the performance of his duties as a juror. *See Wainwright v. Witt*, 469 U.S. 412, 424 (1985) ("[J]uror's bias [need not] be proved with unmistakable clarity." (internal quotation marks omitted)); *Burns*, 237 Ariz. at 13 ¶ 23 ("A trial judge must consider the entirety of a prospective juror's demeanor and behavior; if a juror's promise to uphold the law is coupled with ambiguous statements and uncertainty, the trial judge may strike the juror for cause."). Accordingly, the trial court did not abuse its discretion in striking Juror 123 for cause.

¶37　　　Hulsey further argues that it was structural error for the trial court to curtail counsels' questioning of Juror 123. However, defense counsel exhausted all questions and turned over the juror to the prosecution before the court excused the juror. The court allowed questioning to continue until the juror, when clarifying his answer on the questionnaire, reiterated that if someone kills another he "would not sentence them to death." "A trial court has discretion to determine the scope of voir dire, which we will not overturn absent an abuse of that discretion." *State v. Smith*, 215 Ariz. 221, 230 ¶ 37 (2007). There was no abuse of discretion in discontinuing questioning when the defense was permitted to ask all the questions it wanted.

## II. Guilt Phase Issues

### A. Admission of other-act evidence under Rule 404(b)

¶38　　　Hulsey claims that the admission of evidence involving his methamphetamine use the night before and the morning of the crimes was

improper under Arizona Rule of Evidence 404(b). Normally, this Court reviews admission of other-act evidence for abuse of discretion. *State v. VanWinkle*, 230 Ariz. 387, 392 ¶ 18 (2012). However, Hulsey failed to specifically object in the trial court to any admission of evidence on 404(b) grounds. When evidence is admitted without objection, this Court reviews for fundamental error. *State v. Hargrave*, 225 Ariz. 1, 9 ¶ 18 (2010).

¶39 Hulsey moved to compel the State to provide notice of the evidence it intended to introduce at trial pursuant to Rule 404(b). Hulsey wanted to "avoid prejudice before the jury, and to avert any surprise through the opportunity for *pretrial* objection."

¶40 In response, the State explained that it intended to present evidence that Hulsey had used methamphetamine on the day before the murder, and that on the morning of the shooting when Officer Goitia began following the car, Hulsey pulled out a pipe and methamphetamine and gave it to back-seat-passenger Patsy Jones to hide. After the State described the proposed opening statement, the trial court asked if Hulsey's motion related to those statements. The defense said "yes," but questioned whether there was any factual basis for the statements, and also stated that the defense would "stand by the comments . . . already made in the motion." The motion only discussed the mandate that the prosecution provide a list of any prior acts evidence it intended to introduce. It did not contain an objection to this particular evidence.

¶41 In conducting its analysis under Rule 404(b), the trial court concluded that the probative value of the evidence was not outweighed by any prejudicial effect, and allowed the statements in the State's opening remarks. Additionally, in conducting a Rule 403 analysis of a picture of the contents of a duffel bag in the back seat of the car, which included a gun and drugs, the court noted that the presence of drugs "can relate to motive" and allowed Detective Bustoz to testify that methamphetamine was in the bag.

¶42 During the State's opening, the prosecutor mentioned Hulsey's methamphetamine use three times. He noted that on the night before the crimes and again about an hour before the murder, Hulsey

smoked methamphetamine from a glass pipe. The State also mentioned that when the officer began following the car, Hulsey took the pipe and methamphetamine and asked Jones to hide them in the back seat.

¶43        During trial, evidence of the prior acts was elicited during Jones' direct examination when she testified that Hulsey and Kostas used methamphetamine the night before the murder. She testified that Hulsey pulled out a pipe and drugs at Jones' house when he arrived. She explained that Hulsey, Kostas, and she all took hits from the pipe. She also testified that once the police car began following them, Hulsey handed her the pipe and the bag to hide in the back seat. No objections were made to this testimony.

¶44        Hulsey asserts that the court allowed the mention of prior acts during opening statements over objection, but he is mistaken. His motion to compel contained no objection to discussing a specific "other act," and he did not object on Rule 404(b) grounds at the hearing before the opening statements. Hulsey instead argued that the trial court did not properly scrutinize the evidence and that it was not relevant.

¶45        Rule 404 permits the introduction of evidence of "other" possibly prejudicial acts if a proper purpose is shown under subsection 404(b). *State v. Lee*, 189 Ariz. 590, 599 (1997). Evidence of other acts is admissible to prove "motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident." Ariz. R. Evid. 404(b). The evidence must also be relevant under Rule 402; the probative value of the evidence must not be substantially outweighed by the potential unfair prejudice under Rule 403; and "the court must give an appropriate limiting instruction if requested under Rule 105." *Lee*, 189 Ariz. at 599. Here, all four requirements were satisfied.

¶46        The admission of the use-of-meth evidence was proper because both the paraphernalia in the car and the drug use explain Hulsey's reaction to the police officers' presence and his behavior that followed. A reasonable inference is that he was agitated and pulled out the gun because he knew he had illegal substances on his person and in the car. The use of the drugs also explains Hulsey's agitation and flight, as well as his use of

his gun.

¶47          The trial court ruled that the acts' probative value was not substantially outweighed by the prejudicial effect, and Hulsey provides no reason to disturb that ruling. *See State v. Williams*, 133 Ariz. 220, 230 (1982) (stating that Rule 403 findings should not be disturbed unless the trial court abused its discretion). Finally, Hulsey did not request a limiting instruction. Allowing admission of the evidence of prior acts was neither an abuse of discretion nor fundamental error.

### B. Instructions on lesser-included offenses and causation

¶48          Hulsey requested that jurors receive an instruction on second degree murder, manslaughter, and negligent homicide as lesser-included offenses of the charge of first degree murder of a police officer. The trial court denied Hulsey's request, finding that no evidence supported giving the requested instructions. The court specifically noted that the only testimony presented regarding intent was from Jones, who "described [the shooting] as intentional."

¶49          Hulsey then requested that the trial court give a modified Revised Arizona Jury Instruction ("RAJI") 2.03 that stated:

> In order to find the Defendant guilty of murder, you must find that the death of Anthony Holly was caused by a bullet fired by the Defendant hitting him. If you find that a bullet fired by the Defendant did *not* hit Anthony Holly, you must find the Defendant not guilty of murder.

¶50          The State opposed the requested instruction on the ground that it would amount to an improper comment on the evidence. The trial court agreed.

¶51          The court took the matter under advisement and the following day reaffirmed that it would not instruct the jurors further about what to do if they found that Officer Goitia's bullet hit Officer Holly. The

court indicated it would give RAJI 2.03 unmodified,[3] but the defense did not request that instruction and therefore it was not given.

**¶52**      The jury was ultimately instructed on first degree murder of a police officer and attempted first degree murder and, with respect to causation, that first degree murder required proof that the "Defendant caused the death of the law enforcement officer."

**¶53**      "[A] defendant is entitled to a lesser included offense instruction where the evidence warrants it." *Beck v. Alabama*, 447 U.S. 625, 636 (1980).  We review issues pertaining to jury instructions for abuse of discretion.  *State v. Delahanty*, 226 Ariz. 502, 507 ¶ 22 (2011).  Whether an offense is included within another is a question of statutory interpretation that we review de novo.  *State v. Geeslin*, 223 Ariz. 553, 555 ¶ 9 (2010).  When there has not been a request for an instruction on a lesser-included offense, this Court reviews for fundamental error.  *State v. Whittle*, 156 Ariz. 405, 407 (1988).

1. Lesser-included offenses of first degree murder

**¶54**      Hulsey claims that second degree murder, manslaughter, and negligent homicide instructions were necessary because "the evidence was

---

[3] "Causation Instruction—Intervening Event: Conduct is the cause of a result when both of the following exist: 1.) But for the conduct the result in question would not have occurred.   2.) The relationship between the conduct and result satisfies any additional causal requirements imposed by the definition of the offense.  In order to find the defendant guilty of [the crime], you must find that the [death] [injury] was proximately caused by the acts of the defendant.  The proximate cause of a [death] [injury] is a cause which, in natural and continuous sequence, produces the [death] [injury], and without which the [death] [injury] would not have occurred.  Proximate cause does not exist if the chain of natural effects and cause either does not exist or is broken by a superseding intervening event that was unforeseeable by the defendant and, with the benefit of hindsight, may be described as abnormal or extraordinary.  The State must prove beyond a reasonable doubt that a superseding intervening event did not cause the [death] [injury]."  RAJI Stand. Crim. 2.03.

inconclusive" as to whether Hulsey discharged his gun recklessly or accidentally — rather than, as alleged, intentionally or knowingly. He further claims that if the jury had been given instructions on lesser-included offenses, they might have found that, after Hulsey took out his gun, "Officer Goitia overreacted, began shooting immediately and he accidentally shot Officer Holly," establishing that Hulsey did not intentionally kill Officer Holly. Specifically, Hulsey argues that Officer Goitia's testimony that Hulsey pulled the gun and "whirled" provides evidence of recklessness; thus, the lesser-included offense instructions were necessary. *See* A.R.S. §§ 13-1104(A)(3) (with extreme indifference to human life, defendant recklessly causes death of another person), -1103(A)(1)–(2) (recklessly causing death of another person, or result of adequate provocation), -1102(A) (negligently causing death of another person).

**¶55** "If the facts of the case as presented at trial are such that a jury could reasonably find that only the elements of a lesser offense have been proved, the defendant is entitled to have the judge instruct the jury on the lesser-included offense." *State v. Wall*, 212 Ariz. 1, 3 ¶ 14 (2006) (explaining that lesser-included offense instruction is appropriate "when the greater offense cannot be committed without necessarily committing the lesser offense," and "the evidence is sufficient to support giving the instruction" (internal quotation marks omitted)). This Court has previously stated that:

> We deem evidence sufficient to require a lesser-included offense instruction if two conditions are met. The jury must be able to find (a) that the State failed to prove an element of the greater offense and (b) that the evidence is sufficient to support a conviction on the lesser offense. It is not enough that, as a theoretical matter, "the jury might simply disbelieve the state's evidence on one element of the crime" because this "would require instructions on all offenses theoretically included" in every charged offense. Instead, the evidence must be such that a rational juror could conclude that the defendant committed only the lesser offense.

*Id.* at 4 ¶ 18 (internal citations omitted) (quoting *State v. Caldera*, 141 Ariz. 634, 636–37 (1984)).

18

**¶56**        The trial court correctly concluded that no evidence presented at trial supported a finding of guilt only on a lesser-included offense, thus lesser-included offense instructions were inappropriate. *See State v. Bearup*, 221 Ariz. 163, 168 ¶ 23 (2009). The evidence supported the jury's finding of an intentional act: Hulsey pulled a gun from his waistband, raised it, turned it sideways, aimed, stated "I've got something for you" or "I've got this for you," and fired. The only evidence that could support a lesser-included offense was Hulsey's "whirling" or turning; but that movement does not negate the evidence regarding Hulsey's intent—lifting the gun, taking aim, and firing. The trial court did not abuse its discretion in refusing to provide the instruction of second degree murder, or any other lesser-included offense.

### 2. Provocation manslaughter instruction

**¶57**        Hulsey correctly argues that even though provocation manslaughter is not a lesser-included offense of second degree murder, this Court has found the instruction proper "when supported by the evidence." *State v. Lua*, 237 Ariz. 301, 305 ¶ 14 (2015). But just as there was no evidence to support a lesser-included offense instruction on second degree murder, there was also no evidence to support an instruction on provocation manslaughter. Hulsey argues that the evidence shows that Hulsey fired a shot toward Officer Goitia "after [Goitia] began shooting at [Hulsey]." The only evidence on this point, however, shows that Officer Goitia returned fire *after* Hulsey pulled his gun and aimed at the officers. Accordingly, because Hulsey has shown no evidence that the officers first provoked him, it was neither fundamental error nor an abuse of discretion to refuse the instruction for provocation manslaughter.

### 3. Causation instruction

**¶58**        Hulsey argues that the trial court committed reversible error by failing to give his proposed modified RAJI 2.03 causation instruction and to instruct the jury about proximate causation. Both arguments are unavailing.

**¶59**        Although a defendant is entitled to have the jury fully and

accurately instructed on the applicable law, the defendant is not entitled to insist that the instructions be tailored to reflect the actors and evidence in the case. The instruction given to the jury accurately required proof that "Defendant caused the death of the law enforcement officer."

¶60 The trial court also did not err by failing to provide a proximate cause instruction. The trial court offered to give the RAJI 2.03 Causation Instruction—Intervening Event, but Hulsey did not act on the offer. No fundamental error exists where the causation described in the final jury instructions and counsels' arguments adequately addressed the need for the jury to determine that Hulsey, in fact, killed Officer Holly.

### C. Sufficient evidence to support first degree murder conviction

¶61 To prove first degree murder as charged in this case, the State must show that the defendant, intending or knowing that his conduct will cause the death of a police officer, causes the death of a police officer in the line of duty. A.R.S. § 13-1105(A)(3).

¶62 Upon the conclusion of the State's case-in-chief, and on a renewed post-trial motion, Hulsey moved for a judgment of acquittal, maintaining that the State failed to present substantial evidence to prove that Hulsey's bullet killed Officer Holly. Both motions were denied.

¶63 Substantial evidence is that which "reasonable persons could accept as sufficient to support a guilty verdict beyond a reasonable doubt." *State v. Hausner*, 230 Ariz. 60, 75 ¶ 50 (2012). Hulsey argues that the evidence was constitutionally insufficient to show that Hulsey's bullet killed Officer Holly because of: (1) the inconsistent testimony between Officer Goitia and Jones; (2) the absence of stipling at Officer Holly's wound site; (3) the absence of blood near where Officer Holly was shot; (4) the Shot Spotter evidence; and (5) the lack of bullets found matching Hulsey's gun. We disagree. Both Officer Goitia and Jones stated that Hulsey shot first, then took a step forward to shoot again. Jones also stated the first two shots sounded different from the shots fired in succession by Officer Goitia as Hulsey ran from the scene. Officer Goitia testified that he ran around the back of the cars before returning fire.

**¶64**      As the trial court observed, the jury was capable of considering the inconsistencies and questions noted by the defense about who fired the fatal bullet. Nonetheless, there was certainly enough evidence for a reasonable trier-of-fact to conclude, beyond a reasonable doubt, that Hulsey caused the death of Officer Holly.

## III. Aggravation Phase Issues

### A. Constitutionality of A.R.S. §§ 13-751(F)(10) and 13-1105(A)(3)

**¶65**      Hulsey asserts that the (F)(10) aggravator—that the victim was an on duty peace officer killed while performing official duties—is unconstitutional because the crime and aggravator are both based on the victim's status. A.R.S. § 13-751(F)(10). But we previously addressed and rejected this claim, and we decline to revisit that decision. *See State v. Cruz*, 218 Ariz. 149, 169–70 ¶¶ 128–32 (2008) (holding elements of underlying crime may concurrently be used as aggravating circumstances).

**¶66**      Hulsey also argues that using the elements of first degree murder, committing an act that "causes the death of a law enforcement officer who is in the line of duty" under A.R.S. § 13-1105(A)(3) to also make the defendant eligible for a death sentence makes Arizona's death penalty for this crime unconstitutional under *Lowenfield v. Phelps*, 484 U.S. 231, 244 (1988) (outlining requirements needed for capital sentencing scheme to "pass constitutional muster"), because it does not narrow the class of defendants eligible for the death penalty. We disagree. *Lowenfield* requires that the sentencing scheme genuinely narrows the class of persons eligible for the death penalty and therefore ensures that the selected crimes are sufficiently serious that the offense reasonably justifies the severe sentence. *Id.* Here, the aggravator applies only to a small group of perpetrators who intentionally or knowingly kill on duty peace officers. *See State v. Hidalgo*, 241 Ariz. 543, 551 ¶ 24 (2017) ("An aggravating circumstance satisfies this narrowing requirement so long as it applies only to a subclass of murders."); *see also State v. Greenway*, 170 Ariz. 155, 163–64 (1991).

**¶67**      Hulsey additionally claims that A.R.S. § 13-1105(A)(3) is unconstitutional because, without requiring proof of premeditation for a

first degree murder charge, the court impermissibly reduced the State's burden of proof and improperly "elevat[ed]" knowing or intentional murder to first degree murder. This Court reviews a statute's constitutionality de novo, construing it, if possible, to uphold its constitutionality. *State v. Glassel*, 211 Ariz. 33, 51 ¶ 65 (2005).

**¶68** At trial, Hulsey objected that the first degree murder of a police officer jury instructions did not require proof of premeditation. *See* § 13-1105(A)(3).[4] Citing *Whittle*, 156 Ariz. at 404, Hulsey here maintains that "[t]he culpable mental state, premeditation," is required to convict of first degree murder, and this factor is necessary to distinguish it from second degree murder. He also argues that *State v. Thompson* requires premeditation. 204 Ariz. 471, 475 ¶ 15 (2003) ("[F]or the first degree murder statute to be constitutional, the definition of premeditation must provide a meaningful distinction between first and second degree murder.").

**¶69** Hulsey's reliance on *Whittle* and *Thompson* is misplaced. *Thompson* does not say that only premeditated murder can qualify as first degree murder. *See id.* Indeed our cases make clear that for felony murder—which also constitutes first degree murder—the fact that the murder occurred in the course of committing another enumerated felony qualifies the murder as first degree, even if the death was not premeditated, or even anticipated. *See State v. Herrera*, 176 Ariz. 21 (1993) (affirming a death sentence for a defendant convicted of felony murder). *Thompson* addressed the meaning of premeditation; it did not impose additional requirements for proving first degree murder.

**¶70** The legislature has determined that the intentional or knowing murder of a police officer qualifies as a first degree murder, while the second degree murder of a police officer requires only that the defendant intended to cause bodily harm. The potential for jury confusion between first and second degree murder of a police officer is absent here. The statute is not vague.

---

[4] "Intending or knowing that the person's conduct will cause death to a law enforcement officer, the person causes the death of a law enforcement officer who is in the line of duty." A.R.S. § 13-1105(A)(3).

¶71  For all the reasons stated above, Hulsey's first degree murder conviction, and death eligibility based on A.R.S. §§ 13-751(F)(10) and -1105(A)(3) do not violate due process.

## IV. Penalty Phase Issues

### A. Imposition of the death penalty for the seriously mentally disturbed

¶72  Hulsey argues that evolving standards of decency render him exempt from the death penalty because of his uncontroverted serious mental illnesses ("SMI") (depression with psychotic features; schizophrenia; and methamphetamine induced psychosis). He alleges that United States Supreme Court death penalty cases addressing Eighth Amendment violations provide that the death penalty for those with SMI cannot be proportional to a SMI defendant's culpability and, therefore, is unconstitutional. *See Graham v. Florida*, 560 U.S. 48 (2010); *Kennedy v. Louisiana*, 554 U.S. 407 (2008); *Roper v. Simmons*, 543 U.S. 551 (2005); *Atkins v. Virginia*, 536 U.S. 304 (2002). We review de novo the validity of a capital sentencing statute. *State v. Davolt*, 207 Ariz. 191, 214 ¶ 99 (2004).

¶73  As a threshold matter, *Atkins* and *Roper* are unavailing because Hulsey has not shown that he suffers from an intellectual disability,[5] *see Atkins*, 536 U.S. at 321; *see also* A.R.S. § 13-753(H); *State v. Escalante-Orozco*, 241 Ariz. 254, 266–67 ¶¶ 8–9 (2017), and he was not a juvenile when he committed the crime, *see Roper*, 543 U.S. at 568. Moreover, neither case extended a death penalty exemption to those with SMI, and Hulsey has not demonstrated why those cases should be extended apart from a possible trend in that direction. *But see Lewis v. State*, 620 S.E.2d 778, 786 (Ga. 2005) (holding defendants diagnosed with mental illness do not qualify for death penalty exemption); *State v. Hancock*, 840 N.E.2d 1032, 1059–60 ¶¶ 154–58 (Ohio 2006) (same); *Commonwealth v. Baumhammers*, 960 A.2d 59, 96–97 (Pa. 2008) (same). We do not lightly infer the unconstitutionality of statutes, and the decisions in other jurisdictions do

---

[5] Hulsey presented evidence of various IQ scores, ranging from "the lower half of average" to "superior."

not in our view render our death penalty unconstitutional as applied to SMI defendants.

¶74        Hulsey compares SMI defendants to children who received sentences of life without the possibility of parole and correctly argues that the Supreme Court did not find consensus among jurisdictions in *Graham* in order to invalidate life without the possibility of parole sentences for those under the age of eighteen at the time of their non-homicide crimes. *See* 560 U.S. at 62, 82 (holding sentences of life without the possibility of parole for juvenile defendants unconstitutional despite a contrary view in thirty-nine other jurisdictions). However, as the Court later pointed out in *Miller v. Alabama*, "*Roper* and *Graham* establish that children are constitutionally different from adults for purposes of sentencing." 567 U.S. 460, 471 (2012) ("[F]indings . . . of transient rashness, proclivity for risk, and inability to assess consequences . . . both lessened a child's moral culpability and enhanced the prospect that . . . his deficiencies will be reformed." (internal quotation marks omitted)). Importantly, the Court found that those characteristics were not crime-specific and could weaken the rationale for punishment and in turn create a disproportionate punishment thereby violating the Eighth Amendment. *Id.* at 473. Here, Hulsey was not a minor when his crimes occurred, and he has not shown that those with SMI are like children with regard to moral culpability.

¶75        Additionally, in *Kennedy*, the Court clarified that objective indicators of evolving standards were not dispositive and provide only a relevant inquiry. 554 U.S. at 421. Instead, the Court focused on the disproportionality between the crime, rape of a child not resulting in the victim's death, and capital punishment. *Id.* at 437–38. The Court determined that the penalty would do little to further the retributive and deterrent purposes because it did not balance the wrong to the victim or create an incentive not to kill the victim. *Id.* at 442, 445. In *Kennedy*, the Court distinguished between the proportionality of taking the life of a human versus sparing one. *Id.* at 445–46. Because Hulsey did not spare Officer Holly's life, the reasoning in *Kennedy* is inapplicable. Furthermore, Hulsey cannot show that his sentence is disproportionate to the crime of intentionally killing a police officer who is acting in the line of duty; thus, the sentence does not violate the Eighth Amendment.

¶76       Hulsey also argues that juries cannot reliably evaluate those with SMI. He asks us to extrapolate factors from *Roper*, *Atkins*, and *Graham*, and apply them to those with SMI to conclude that the Eighth Amendment categorically bars a death sentence for such defendants. Hulsey points to six factors that cause special difficulties for sentencers in making reliable decisions when dealing with a SMI defendant: those with SMI have difficulty cooperating with lawyers, may make poor witnesses, and may have distorted thought processes; their personalities may be misinterpreted as being aggressive or unremorseful; the necessary expert testimony is often complex; and the brutality of the crimes committed by SMI individuals may prevent jurors from considering the SMI as a mitigating factor.

¶77       Hulsey presented evidence of his mental illness at trial, and the jury was instructed that mitigating factors are "any factors that are a basis for a life sentence instead of a death sentence." This instruction is consistent with Arizona law, which directs the trier of fact to "consider as mitigating circumstances any factors proffered by the defendant or the state that are relevant in determining whether to impose a sentence less than death." A.R.S. § 13-751(G). Mental illness does not categorically bar a defendant from receiving a death sentence because it does not render his sentence grossly disproportionate to his crime, and there is no national consensus "against executing persons with intellectual impairments *short of* intellectual disability or insanity." *People v. Boyce*, 330 P.3d 812, 852 (Cal. 2014) (emphasis in original); *see also Carroll v. Sec'y, Fla. Dep't of Corr.*, 574 F.3d 1354, 1370 (11th Cir. 2009); *Lawrence v. State*, 969 So. 2d 294, 300 n.9 (Fla. 2007); *Lewis*, 620 S.E.2d at 786. Instead, it is up to each juror to determine if a defendant's mental condition is a mitigating circumstance that warrants leniency given the facts of the case. *See State ex rel. Thomas v. Granville (Baldwin)*, 211 Ariz. 468, 473 ¶¶ 18–21 (2005).

¶78       Hulsey was afforded an opportunity to present evidence of his mental condition and other mitigating circumstances to the trier of fact and he has not demonstrated that the jury failed to properly evaluate it. Accordingly, Hulsey's mental condition does not mean his sentence violates the Eighth Amendment.

**B. Admission of videotaped testimony in penalty phase and use by jury during deliberations**

**¶79**     Hulsey presented to the jury videotaped statements from six family members as part of his mitigation evidence.  Hulsey then moved to admit the tapes, but the State objected, stating that they would improperly highlight certain testimony and avowing that, if the court admitted Hulsey's family tapes, the State would move to admit the victim impact testimony.  The trial court denied the motion without prejudice.

**¶80**     During deliberations, the jury asked to review Hulsey's family tapes.  Likening the videos to trial testimony or a recording of the testimony, the court concluded that they were not in evidence and would improperly highlight evidence, and denied the request.  The court offered the defense an opportunity to make a further record on the issue, but the offer was declined.

**¶81**     Hulsey claims his constitutional rights were violated by the trial court denying admission of the video statements and preventing the jury from reexamining them during deliberations. "This Court reviews the admission of evidence in the penalty phase for an abuse of discretion." *Burns*, 237 Ariz. at 28 ¶ 127.  When the defense fails to object, we review the ruling for fundamental error.  *State v. Henderson*, 210 Ariz. 561, 567–68 ¶¶ 19–20 (2005).

1. Admission of the tapes into evidence

**¶82**     Hulsey argues that the trial court improperly applied evidentiary and statutory rules in not admitting the videotapes after allowing them to be played at trial.  He bases his claim on A.R.S. § 13-751(C), which provides that "the defendant may *present* any information that is relevant to any of the mitigating circumstances . . . *regardless of its admissibility* under the rules governing admission of evidence at criminal trials."  (emphasis added).  But the trial court's treatment of the evidence carefully observed the statutory distinction between allowing a defendant to *present* evidence at trial through the tapes and admitting the tapes into evidence.  The trial judge permitted Hulsey to "present [the] information,"

and did so "regardless of" the court's determination that the tapes were inadmissible.

**¶83** Hulsey next argues that the trial judge relied on inapplicable rules of evidence and failed to exercise appropriate discretion in determining the admissibility of the tapes. We note preliminarily that the rules of evidence do not apply in the penalty phase. A.R.S. § 13-751(C); *State v. McGill*, 213 Ariz. 147, 156 ¶ 40 (2006). Hulsey's argument assumes that the trial judge relied on and felt constrained by inapplicable rules of evidence and that the judge failed to exercise discretion in ruling. Hulsey has failed, however, to present any evidence to support his claims.

2. Videotapes in jury deliberations

**¶84** Having concluded that the trial court's ruling denying admission of the tapes was not an abuse of discretion, we next consider whether the trial court's refusal to allow the jury to re-watch the tapes during deliberations was fundamental error. We conclude that it was not.

**¶85** Arizona Rule of Criminal Procedure 22.3 gives trial courts authority to allow jurors to have testimony repeated during deliberations. But it does not require a judge to permit the jury to see requested evidence or hear testimony, and in fact gives authority to deny such requests or provide information to balance any information the judge determines is appropriate for the jury to see. *See* Ariz. R. Crim. P. 22.3 (stating that judge "may" recall the jury to have testimony read and may order reading of other testimony to balance requested testimony). In denying permission for the jury to again view the tapes during deliberations, the trial court noted its concern that selecting certain evidence for review would improperly highlight that evidence, a decision well within the trial court's discretion.

**¶86** In *State v. Chappell*, the jury requested a transcript of the defendant's allocution. 225 Ariz. 229, 241–42 ¶¶ 51–52 (2010). The trial court denied the request, emphasizing that the jury might be subject to undue influence by the written statement. *Id.* at 242 ¶ 54. This reasoning has been echoed in other decisions. *See, e.g.*, *State v. Jovenal*, 117 Ariz. 441,

443 (App. 1977) (citing cases showing fear of undue emphasis when partial transcripts are given to jury). The tapes here are similar to the transcripts in *Chappell*, and the trial court, having seen them, determined that they may be given undue emphasis in deliberations, a conclusion we find no reason to disturb.

¶87 Finally, Hulsey argues that because there were six tapes, it is not likely that any one tape would be given undue influence. But the inclusion of multiple tapes admitted in the aggregate for the same purpose would only exacerbate the trial court's concern of certain testimony being highlighted. The trial court's denial was not an abuse of discretion.

### C. Prosecutorial misconduct

¶88 Hulsey raises several prosecutorial misconduct claims. We review a denial of a motion for mistrial based on cumulative prosecutorial misconduct for an abuse of discretion. *See State v. Lehr*, 201 Ariz. 509, 522 ¶ 56 (2002). We begin by assessing each claim of misconduct; we review objected-to claims for harmless error and unobjected-to claims for fundamental error. *State v. Payne*, 233 Ariz. 484, 511 ¶ 108 (2013); *State v. Roque*, 213 Ariz. 193, 228 ¶ 154 (2006), *overruled on other grounds by Escalante-Orozco*, 241 Ariz. at 267 ¶¶ 11–15. After determining which claims constitute error, this Court reviews the cumulative misconduct to determine whether the total effect rendered defendant's trial unfair. *Roque*, 213 Ariz. at 228 ¶¶ 154–55.

¶89 To succeed in his claim, Hulsey must show that the prosecutor's actions amounted to misconduct and that there is a "reasonable likelihood . . . that the misconduct could have affected the jury's verdict, thereby denying defendant a fair trial." *Anderson*, 210 Ariz. at 340–41 ¶ 45. Here, although prosecutor Juan Martinez engaged in several instances of misconduct or near misconduct, altogether it was not so prolonged or pronounced that it affected the fairness of trial. We address these claims as they were presented.

1. Voir dire

a. Use of the word "debate"

¶90    Hulsey claims that the prosecutor committed misconduct while questioning potential jurors by using the word "debate" to describe proper juror interactions during deliberations.  During voir dire, the court sustained Hulsey's objection and instructed the prosecutor to abstain from using the specific word "debate," instead replacing it with "discussion" in further proceedings.  Thereafter, the prosecution used the word twice, once correcting himself.  Both prospective jurors who heard the word were ultimately put on the jury.

¶91    We agree with the trial court that the use of the word "debate" did not constitute misconduct in this context.

b. Use of the word "bullied"

¶92    Hulsey also claims that the prosecution's use of the word "bullied" in front of Juror 123 to describe the defense counsel's rehabilitation of him was improper.  This claim fails for multiple reasons: the trial court sustained defense counsel's objection to use of the word; Juror 123 was ultimately and properly struck for cause; and the exchange took place outside of the presence of any other potential jurors.  There is no likelihood of harm.

2. Guilt phase

a. Cross-examination of Jaco Swanepoel

¶93    Hulsey claims that the prosecutor "talked over [a] witness and refused to let him answer the questions," and insinuated that the witness was unethical.  He claims that the prosecutor was yelling and screaming at the witnesses and flailing his arms.  At trial, the court overruled defense counsel's objections and stated that the prosecutor simply had a "very animated style."  We cannot conclude from the record that this assessment was incorrect.

29

¶94        Hulsey also claims that throughout cross-examination, the prosecutor asked a series of questions designed to mislead the jury into believing a witness was testifying unethically, constituting improper burden shifting. In ruling on the objection, the court found that there was no evidence of unethical conduct and so instructed the jurors.

¶95        This Court gives great latitude to conclusions drawn by judges who observe trial behavior first hand. *State v. Hansen*, 156 Ariz. 291, 297 (1988) ("[W]e note that the trial court is in a better position to judge whether the prosecutor is unduly sarcastic, his tone of voice, facial expressions, and their effect on the jury, if any."). Hulsey has given this Court no reason to overturn the trial court's conclusion that the prosecutor's tone had no effect on the verdict. Additionally, although "[i]t is improper . . . to imply unethical conduct on the part of an expert witness in the absence of evidentiary support," *State v. Velazquez*, 216 Ariz. 300, 311 ¶ 48 (2007) (internal quotation marks omitted), any improper implication of unethical conduct or burden shifting was remedied when the trial court instructed the jurors that it "specifically found that this witness has not violated any code of ethics as set forth in any document."

b. Closing argument

i. Comments about defense witnesses

¶96        Hulsey claims that the prosecutor insinuated in his closing argument that defense witness Paul Greene, who testified about the Shot Spotter, was untruthful. The prosecutor discussed Mr. Greene's candor and encouraged the jurors to infer that his different styles of answering corresponded with the varying truthfulness of his statements. The prosecutor stated that Mr. Greene "is somebody that you really can't trust."

¶97        Counsel have wide latitude to argue reasonable inferences from the evidence, but cannot make insinuations that have no evidentiary support. *See State v. Cornell*, 179 Ariz. 314, 331 (1994). Here, the prosecutor's conduct was close to crossing the line, but the record did contain facts on which he could fairly base his argument. *See State v. Hughes*, 193 Ariz. 72, 85–86 ¶ 59 (1998). The prosecutor highlighted his observations that Mr.

Greene was sometimes less vocal during cross-examination than in direct examination. From this, the prosecutor told the jurors that in order to assess Greene's credibility, they should consider the way he answered questions. In context, the comments were not improper.

ii. Comments about defense counsel and defense theory

¶98        Hulsey maintains that throughout the closing argument, the prosecutor continued to imply that defense counsel was a liar and made other personal attacks. During closing argument, the prosecution invoked the story of Don Quixote and compared the defense's theory to tilting at windmills. He repeatedly analogized the defense's evidence in the case to the imaginary monsters in that story. He stated that the defense wanted the jury to "[go] to Neverland" and enter the "Land of Oz." Hulsey unsuccessfully moved for mistrial based on the "unethical behavior."

¶99        While commentary about the defense's theory is common, "[a]n argument that impugns the integrity or honesty of opposing counsel is . . . improper." *Id.* at 86 ¶ 59; *see also State v. Lynch* (*Lynch II*), 238 Ariz. 84, 96–97 ¶¶ 28–29 (2015) (illustrating improper commentary towards counsel as suggesting defense counsel fabricated evidence), *rev'd on other grounds*, *Lynch III*, 136 S. Ct. 1818 (2016); *cf. State v. Amaya-Ruiz*, 166 Ariz. 152, 171–72 (1990) (no error where prosecutor referred to defense as "smoke screen"). The prosecutor's comments equating defense counsel to Don Quixote were different from those discussing defense theories. The prosecution impugned defense counsel's integrity by suggesting he was purposely leading the jury on a make-believe expedition. *See Hughes*, 193 Ariz. at 86 ¶ 59. These improper statements, however, were brief and on this record we cannot say that they affected the jury's verdict, especially in light of the instruction to the jury that counsel's arguments are not evidence. *See Newell*, 212 Ariz. at 403 ¶ 67.

¶100       Hulsey raises an additional unobjected-to-claim—that the prosecution personally attacked defense counsel regarding a rhetorical statement made by defense counsel about the attempted first degree murder instruction. The prosecutor pointed out the peculiarity of defense

counsel interjecting himself into his closing argument by stating that he did not know what the instruction meant. The prosecution questioned the relevance of such a statement. This exchange was not an improper attack on defense counsel constituting fundamental error.

### iii. Misstating the evidence

¶101 Hulsey argues that the prosecution misstated the law by stating that "knowingly" was a lesser standard of proof than "intending." This objection was sustained, and the trial judge stated, "Let's not call it lesser. Let's call it different." Any misstatement was therefore cured.

¶102 Hulsey claims that the prosecutor misstated the evidence by arguing that the recording of Officer Goitia's initial report stated that he ran into the middle of the street and began firing. There were three separate accounts at issue in this portion of the argument. Here, the prosecutor was "urg[ing] the jury to draw reasonable inferences from the evidence." *State v. Bible*, 175 Ariz. 549, 602 (1993). The trial court correctly overruled the objection and stated that the "jury can decide who's correct."

¶103 Hulsey additionally argues that the prosecutor misstated evidence by arguing that the experts indicated that the .40-caliber bullet was not going to fragment. Hulsey is correct that the experts stated that both bullets *could* fragment, but testimony showed that the .40-caliber bullet was designed not to fragment, which differed specifically from the .357-caliber bullet from Hulsey's gun. Here, because the testimony showed that the chances of the .357-caliber bullet not fragmenting were "exceptions," the prosecutor's argument was not a misstatement of the evidence constituting misconduct. *See id.* (prosecutor can urge jury to draw reasonable inferences).

### iv. Disparate theories

¶104 Hulsey argues that the prosecution presented "diametrically opposed theories of the same evidence." Hulsey claims that the prosecutor first argued in the guilt phase that Officer Holly was shot at the back end of the car, and then in the aggravation phase he placed Officer Holly at the

front of the car so he could argue that Jones and Kostas were in the "zone of danger," thus qualifying for an additional aggravator. *See* A.R.S. § 13-751(F)(3).

¶105 During the guilt phase, the prosecution argued that Jones testified that Officer Holly was standing near enough to the back-passenger side of the car for Jones to hand him the temporary registration; the prosecutor repeated that Officer Holly's "body was found in the back of the [car] facing westbound." In the aggravation phase, the prosecutor stated Officer Holly was "in the back of the [car]," and "[m]aybe [Officer Holly] took a step or two but he was standing in the back of the [car] and went down and fell face forward." These are not diametrically opposed theories.

### v. Improper vouching for Patsy Jones

¶106 Hulsey argues that the prosecutor improperly vouched for Jones in his closing argument when he stated that she "told you how many [rounds were fired]. Four rounds. Do you think she sat down and read the police report? No, they don't. She's not privy to that. She didn't make it up. She's somebody who heard it." Hulsey argues that this statement referred to matters outside the record and constituted improper vouching.

¶107 "Prosecutorial vouching occurs if, among other things, the prosecutor suggests that information not presented to the jury supports the evidence, testimony, or witness." *Payne*, 233 Ariz. at 512 ¶ 109 (internal quotation marks omitted). The prosecutor stating that Jones was not privy to the police report was improper, but this comment gave at most de minimis support for her testimony. Hulsey cannot establish fundamental error because the trial court and counsel explained that the lawyers' arguments were not evidence, *see State v. Ramirez*, 178 Ariz. 116, 127 (1994) (presuming jurors follow court's instructions), and he has not identified how he was prejudiced by the improper vouching.

### vi. Appealing to jurors' passions

¶108 During his closing argument, the prosecutor stated that Officer Holly "was the first to answer the call. It was the call to his death." Hulsey claims that this and the prosecutor's recitation of the victim impact

statement including Officer Holly's father's statement during the penalty phase of visualizing his son's "last agonizing moments" and his "[attempt] to breathe" improperly appealed to jurors' passions. Both claims fail.

¶109    Statements are improper if they (1) "call to the attention of the jurors matters that they would not be justified in considering in determining their verdict, and (2) [there is a high] probability that the jurors, under the circumstances of the particular case, were influenced by the remarks." *State v. Jones*, 197 Ariz. 290, 305 ¶ 37 (2000) (citing *Hansen*, 156 Ariz. at 296–97).

¶110    Both claims were unobjected-to, and therefore to warrant reversal must present fundamental error. Here, the "call to his death" comment did not improperly appeal to the passions of the jury. The statements were not outside of the matters to be considered by the jurors, nor was there a high probability the jurors were influenced by the remarks. No error occurred.

¶111    In *Burns*, 237 Ariz. at 30 ¶¶ 141–42, this Court cautioned against piling up victim impact evidence for fear that it may cross the line. There, however, the state presented more than a dozen victim impact statements, some from people who never met the victim. *Id.* This Court noted that brief remarks about visualizing a victim's final moments were not unduly prejudicial. *Id.* ¶ 141. Hulsey objects to statements from Officer Holly's mother and father that briefly mentioned the last moments of their son's life. Here the statements were not unduly prejudicial and no fundamental error occurred.

vii. Statements about the traffic stop search

¶112    Hulsey claims that the following excerpt from the prosecutor's closing improperly commented on his refusal to consent to the search.

> And so the police officer says you want me to search you -- I want to search you. We agree he says no. Clearly, he's in control of the situation. He wasn't scared, wasn't going to say

34

no, didn't have to say no. So it wasn't a situation where he panicked or anything like that, no. When he asked may I search you, very calmly he said no, uh-huh. I am not going to let you do that. So that's a calm individual. It's not somebody who is so high on drugs, doesn't know what's going on. He knows what's going on.

¶113 We need not decide whether the phrase "didn't have to say no" was improper because it was not argued as evidence of guilt. This discussion solely addressed Hulsey's demeanor at the traffic stop. The prosecutor made no comment on his invocation of his Fourth Amendment rights as evidence of guilt. *Cf. State v. Stevens*, 228 Ariz. 411, 414–15 ¶¶ 8–9 (App. 2012) (prosecutor referring to defendant's refusal of search as a result of concern about being arrested and because defendant had something to hide). The prosecutor argued only that the refusal implied that Hulsey was "calm" and "in control of the situation," and not "scared" or "panicked." Hulsey was thus not prejudiced by the statement.

viii. Referring to evidence not admitted at trial

¶114 Hulsey also argues that the prosecutor committed error when he referred to evidence not admitted at trial by stating that Hulsey produced his brother's driver's license at the initial traffic stop. Attorneys "are not permitted to introduce or comment upon evidence [that] has not previously been offered and placed before the jury," but the false identification was discussed in testimony and already in evidence. *State v. Gonzales*, 105 Ariz. 434, 437 (1970). To the extent that the reference to the real Bradley Hulsey in the courtroom was error, its brevity and inconsequential nature does not constitute fundamental error.

3. Penalty phase

a. Duty of the jury argument

¶115 Hulsey claims that it was error for the prosecutor to quote poet John Donne at the end of the penalty phase by proclaiming:

35

> [E]very person's death diminishes me, for I am involved in
> mankind. Therefore, send not to know for whom the bell
> tolls; it tolls for thee, and in this case, in light of the jury
> instructions and what has been presented, it tolls for each of
> you to do your duty and return a verdict of death.

Hulsey argues that this was an improper argument insinuating that it was
the jury's duty to find death appropriate. It was error for the prosecutor to
suggest the jurors had a duty to find a death sentence appropriate. *See
United States v. Young*, 470 U.S. 1, 18 (1985) (telling the jury it must "do its
job" was error); *see also Roque*, 213 Ariz. at 224 ¶ 128 (misconduct exists
where "remarks called to the jurors' attention matters that they should not
consider"). The context of the remark, however, was not of such magnitude
to influence the jurors and cause Hulsey prejudice. *State v. Moody*, 208 Ariz.
424, 460 ¶ 151 (2004) (improper remarks must influence the jury to be
reversible). The jurors were correctly instructed that they should consider
all mitigation evidence and should choose a life sentence if they found the
mitigation evidence sufficiently substantial to call for leniency. *Baldwin*, 211
Ariz. at 473 ¶ 21 ("[T]he determination whether mitigation is sufficiently
substantial to warrant leniency . . . is a sentencing decision to be made by
each juror . . . .").

### b. Cross-examination of penalty phase experts

**¶116**     Hulsey contends that "loud verbose witness attacks began in
earnest" as the prosecutor cut off answers and raised his voice at Dr. John
J. Wicks, a psychologist who testified regarding Hulsey's mental
abnormalities. Hulsey objected and the trial court overruled, stating that it
was just the prosecutor's style. Hulsey also notes that the trial court
sustained objections regarding the prosecutor's tone in both Dr. Albert
Globus' and Dr. Mark Cunningham's testimony, warning the prosecutor to
"keep the tone." Hulsey further states that the trial court "admonished [the
prosecutor] to not be disrespectful" in his cross-examination with the
prison expert, James Aiken.

**¶117**     The trial court observed that the prosecutor's tone was
consistent for all witnesses and that there was no misconduct. As stated

above, *see supra* ¶¶ 93–95, the trial court is in the best position to gauge whether a counsel's tone crosses the line into misconduct. Here, Hulsey has given us no reason to disturb the court's finding.

### c. Misstatement of the law

**¶118**　　　　Hulsey argues that the prosecutor misstated the law when he argued that the jury should not consider whether the defendant was high at the time of the shooting because there must be a nexus between the mitigation and the crime. The trial court overruled the objection and stated that the jury could determine what the instructions say and the defense could point that out in rebuttal.

**¶119**　　　　This misstatement of law was improper. *See Anderson*, 210 Ariz. at 349 ¶ 93 ("[The] jury cannot be prevented from giving effect to mitigating evidence solely because the evidence has no causal 'nexus' to a defendant's crimes." (citing *Tennard v. Dretke*, 542 U.S. 274, 282–87 (2004))). However, the trial court instructed the jurors that they were not required to find a connection between the mitigating circumstance and the crime in order to consider the evidence. Further, defense counsel explained in rebuttal that there was no need for a nexus between mitigation and the crime. Defense counsel also argued to the jury that the prosecutor was ignoring the instructions and asking the jury to ignore them as well. Any error here was cured. *See State v. Patterson*, 230 Ariz. 270, 276 ¶ 25 (2012) (noting court instructions may help cure error resulting from prosecutor's misstatement of law).

### d. Liar remarks

**¶120**　　　　Hulsey claims that the prosecution argued over objection that both defense counsel and defense expert, Dr. Wicks, lied to the jury regarding Hulsey's IQ. Referring to Dr. Wicks, the prosecutor stated:

> He lied. He's a doctor and he is a psychologist and he's board certified. Give him all that. Put him on the pulpit, but that hero has clay feet. That guy came in here, looked you -- and remember how he looked at you when he was doing direct

examination, looked you right in the eye and lied.

After the objection was overruled, the prosecutor explained that the expert misstated what tests he ran and that he "made up a number."

**¶121** The record generally shows that the prosecutor would not let Dr. Wicks explain his reasons for picking a prorated number and why he would have "made up a number." The prosecution accurately argued that Dr. Wicks "did all these tests and didn't report them," but incorrectly stated that Dr. Wicks lied by stating that he completed the two-phase test. To the extent that the prosecutor insinuated that Dr. Wicks acted unethically, it was improper; and any insinuation that the time constraints were Dr. Wicks' fault was also improper. But any effect this may have had on the jury subsided on redirect, when defense counsel gave Dr. Wicks an opportunity to explain any inconsistencies. Dr. Wicks told the jury he had to prorate the score of one of the tests because he was running out of time and discussed standard protocol. Moreover, the trial court instructed the jury that the arguments of counsel were not evidence.

### 4. Cumulative error

**¶122** Hulsey claims that the prosecutor's "repeated and pervasive attacks on defense witnesses; improper questions and jury arguments were intentional and calculated to 'win-by-any-means.'" *Cf. State v. Jorgenson*, 198 Ariz. 390, 390–91 ¶ 2 (2000). Hulsey contends there is a reasonable likelihood that the misconduct tainted the verdict. *See id.* When assessing cumulative error, this Court "consider[s] whether persistent and pervasive misconduct occurred and whether the cumulative effect of the incidents shows that the prosecutor intentionally engaged in improper conduct and did so with indifference, if not specific intent, to prejudice the defendant." *Lynch II*, 238 Ariz. at 100 ¶ 51.

**¶123** Here, the lack of respect, poor courtroom decorum, and unnecessary verbal attacks on defense counsel and experts were unbecoming of an Arizona prosecutor, especially one with as much experience as Mr. Martinez. By engaging in such conduct, a prosecutor places a case in serious danger of mistrial. However, "[w]e do not . . .

reverse convictions merely to punish a prosecutor's misdeeds []or to deter future misconduct." *Moody*, 208 Ariz. at 460 ¶ 162. We do, though, once again remind prosecutors, and particularly Mr. Martinez (whose misbehavior has been repeatedly noted in prior cases), that they are to act as ministers of justice and exercise professionalism even in the heat of trial. *See* Ariz. R. Sup. Ct. 42, Ethical Rule 3.8 cmt 1. Nonetheless, Hulsey has failed to show that the actual misconduct in this case so permeated and infected his trial as to render it unfair. *See Payne*, 233 Ariz. at 515 ¶ 134. The court's instructions to the jury helped mitigate any impact the cumulative misconduct had. Hulsey thus failed to show that cumulative error denied him due process. *See generally Hughes*, 193 Ariz. at 79 ¶ 26.

### D. *Simmons* error

**¶124** The preliminary aggravation phase instructions introduced the sentencing process to the jury, outlining the jury's general responsibilities in both the aggravation and penalty phases. The instructions specified that if the jury found a life sentence appropriate, the judge would then sentence the defendant "to either life imprisonment without the possibility of release from prison, or life imprisonment with the possibility of release after 25 years." The instruction that contemplated release for Hulsey was stated three times in the opening aggravation phase instructions. Hulsey objected to the preliminary instruction, claiming that the instruction incorrectly stated the law and implied to the jury an illusory potential for release and that the error was prejudicial because it improperly preconditioned the jury to impose a death sentence. Hulsey objected to the instructions and asked to delete the paragraphs that mentioned the "possibility of release."

**¶125** At oral argument on the objection, Hulsey explained that because the aggravation instruction discussed potential penalties, he intended to rebut the possibility of release in Arizona. The trial court denied the request, finding it an inappropriate discussion for the aggravation phase. The court noted that the subject could arise in the penalty phase, and the request could be revisited then.

**¶126** At the penalty phase, which began less than two weeks after

the aggravation phase concluded, the trial court's proposed instructions indicated that the jury would determine whether Hulsey should be "sentenced to life imprisonment or death." Hulsey did not object to this instruction but did maintain his objections from the aggravation phase.

¶127        In setting the penalty phase instructions, the trial court "forecast[ed]" that Hulsey might request to discuss his parole ineligibility and ruled that parole ineligibility was not an appropriate subject for mitigation. The court granted the State's request that the issue not be discussed. Hulsey did not request a *Simmons* instruction or argue parole eligibility further. *See Simmons v. South Carolina*, 512 U.S. 154, 160 (1994).

¶128        Hulsey contends that the trial court's refusal to permit the jury to consider his parole ineligibility was error under *Simmons*. In *Simmons*, the United States Supreme Court held that when the defendant's future dangerousness is at issue, the jury cannot be presented with the "false choice between sentencing petitioner to death and sentencing him to a limited period of incarceration," and thus must be informed of parole ineligibility. *Id.* at 161. In Arizona, parole is only available for juveniles and defendants who committed an offense before January 1, 1994. *See* A.R.S. § 41-1604.09. Because Hulsey's offense occurred after 1994, he was not eligible for parole. Simply because Arizona chooses to use the term *release* as opposed to *parole* does not "[diminish] a capital defendant's right to inform a jury of his parole [or release] ineligibility." *Lynch III*, 136 S. Ct. at 1819. We hold that the trial court's order precluding discussion of parole ineligibility was error and not harmless.

### 1. Future dangerousness

¶129        The State argues that *Simmons* is inapplicable because the State did not put Hulsey's future dangerousness at issue. We disagree. The prosecutor need not explicitly raise future dangerousness for it to be at issue. *See Escalante-Orozco*, 241 Ariz. at 286 ¶¶ 123–24. "Evidence of future dangerousness under *Simmons* is evidence with a tendency to prove dangerousness in the future; its relevance to that point does not disappear merely because it might support other inferences or be described in other terms." *Kelly v. South Carolina*, 534 U.S. 246, 254 (2002).

¶130        During the penalty phase, the prosecutor discussed Hulsey's proclivity throughout his life to get into fights, stating, "He just gets angry and wants to beat people up, whether he is high or not," and, "If you don't agree with him, he will explode." The prosecutor recounted testimony that Hulsey "likes to see when you put a firecracker in a cat's anus just so you can see the entrails flow out as the cat dies. That's what he said. That's what he likes to see." The prosecutor repeatedly mentioned how an expert who contacted Hulsey was afraid of him and felt threatened.

¶131        The prosecution also elicited testimony that when previously incarcerated, Hulsey had choked a fellow inmate and threatened the inmate and other inmates who saw the incident. In one incident report, an inmate claimed Hulsey told him, "if anybody opens their mouth or says anything about it, everybody knows what will happen." In his penalty phase closing remarks, the prosecutor reminded the jury that Hulsey is an individual "who when things don't go his way, well -- or somebody disagrees with him, there's problems; there is a consequence." Thus, Hulsey's future dangerousness was squarely at issue.

¶132        The State urges this Court to follow jurisdictions that conclude that to trigger *Simmons*, the prosecutor must present specific evidence of future dangerousness and argue it. *See, e.g.*, *Baumhammers*, 960 A.2d at 91 n.23. But the Supreme Court has held that future dangerousness is raised if the evidence suggests it; the prosecutor need not argue it. *See Kelly*, 534 U.S. at 253–54 ("A jury hearing evidence of a defendant's demonstrated propensity for violence reasonably will conclude that he presents a risk of violent behavior, whether locked up or free, and whether free as a fugitive or as a parolee."). Here, the prosecution repeatedly referred to Hulsey's dangerous proclivities, which was more than ample to trigger *Simmons*.

### 2. Objection and request

¶133        The State contends that *Simmons* is inapplicable because Hulsey did not ask to inform the jury regarding his parole ineligibility during the penalty phase. In *Shafer v. South Carolina*, the Court stressed that "[i]t is only when the jury endeavors the moral judgment whether to

impose the death penalty that parole eligibility may become critical." 532 U.S. 36, 51 (2001). The Court explained that when the jury is determining the existence of an aggravator, there is no sentencing discretion and no "false choice[s] to guard against." *Id.* (internal quotation marks omitted). In doing so, the Court pronounced that "only at . . . a stage at which . . . provides no third choice" does *Simmons* come into play. *Id.* Although the *Simmons* objection was initially raised prematurely in the aggravation phase (albeit when the harmful and erroneous instructions were given), the objection was preserved and preemptively rejected in the penalty phase.

¶134 As noted above, an improper instruction mentioning the possibility of release was given three times at the start of the aggravation phase. Although the purpose of the instruction was to outline the sentencing procedure generally, the instruction nevertheless discussed the jury's sentencing discretion at a moment "where as a legal matter, there [was] no possibility of parole." *Shafer*, 532 U.S. at 51 (quoting *Ramdass v. Angelone*, 530 U.S. 156, 169 (2000)). Critically, at that point, Hulsey requested to inform the jury about his parole ineligibility. He argued that his defense would be "hamstr[ung]" if the jury were instructed about the possible penalties without also receiving an explanation of those penalties. Hulsey maintained those objections through the penalty phase.

¶135 The court overruled the objections. The prosecutor treated the issue as already having been resolved: "[T]here was an issue that was raised that [defense counsel was] going to talk about the 25-to-life issue. I think that's already been put to rest, so I would like an order indicating that those issues are not to be discussed."

¶136 Although a trial court generally may refuse to instruct the jury on parole ineligibility before the penalty phase, *see Shafer*, 532 U.S. at 50, the trial court erred here. During the aggravation phase, the trial court instructed the jury, over Hulsey's objection, that a life sentence might leave him eligible for release, and refused to allow Hulsey to discuss his parole ineligibility. During the penalty phase, the trial court reaffirmed its earlier ruling, and anticipated and preemptively rejected Hulsey's further objection. Referencing Hulsey's earlier objection and request makes clear that the trial court understood Hulsey's objections to be a *Simmons* request.

*See State v. Fulminante*, 193 Ariz. 485, 503 ¶ 64 (1999) ("An objection is sufficiently made if it provides the judge with an opportunity to provide a remedy."). Where future dangerousness is at issue, "the actual duration of the defendant's prison sentence is indisputably relevant," *Simmons*, 512 U.S. at 163, so Hulsey should have been permitted to argue that he would never be released from prison.

¶137 We also reject the suggestion that the jurors were unaware of the possibility of release—and therefore were not confronted with a false choice—because the judge did not repeat the "release" sentencing option during the penalty phase. The aggravation phase instructions provided that in the event the jurors chose life, the judge would then "sentence the defendant to either life imprisonment without the possibility of release from prison, or life imprisonment with the possibility of release from prison after 25 years." That instruction was given three times. The penalty phase instructions outlined the jury's options as life imprisonment or death, without redefining what life imprisonment meant. The impression that Hulsey "could be released on parole if he were not executed" was created by the court in the aggravation phase and was never rectified. *Simmons*, 512 U.S. at 161. Because this misperception was never cured or contradicted, its impact carried over to the penalty phase. *See generally State v. Prince*, 226 Ariz. 516, 537 ¶ 80 (2011) ("Jurors are presumed to follow jury instructions.").

¶138 Contrary to the State's assertion, our conclusion does not give rise to the "functional approach" to *Simmons* decried in *Ramdass*. 530 U.S. at 169 (rejecting an expansion of *Simmons'* application where "possibilities are many, the certainties few"). The jury's lack of an accurate parole eligibility instruction was not a result of Hulsey's inaction; rather, the opportunity for such an instruction was foreclosed by the trial court after analysis of the pending request. *Cf. Townes v. Murray*, 68 F.3d 840, 850 (4th Cir. 1995) (defining defendant's right under *Simmons* as "one of opportunity, not of result"). We therefore hold that Hulsey did not waive his right to inform the jury about his parole ineligibility.

¶139 The State further claims that after the trial court denied the opportunity to discuss parole ineligibility during the aggravation phase,

Hulsey affirmatively decided against requesting a *Simmons* instruction during the penalty phase. But this misapprehends the conversation between court and defense counsel. The context makes clear that Hulsey's counsel was disclaiming any intention of mentioning to the jury problems that occurred in a recent execution as a basis for mercy in sentencing. Counsel did not forego arguing that Hulsey would not be eligible for parole.

**¶140**          The State also contends that Hulsey did not intend to discuss parole ineligibility. But his actions at trial show otherwise. At the aggravation phase, Hulsey clearly expressed his intent to explain his parole ineligibility: "[I]t is my intention to comment that [release is] simply not possible in Arizona." Additionally, Hulsey submitted his penalty phase objections without waiving his prior aggravation phase objections. He also filed a motion in limine to preclude the State from injecting future dangerousness into the penalty phase, arguing that it was improper rebuttal and a due process violation. After the trial court explained it would likely deny the motion, Hulsey responded that the United States Supreme Court overturned a sentence because the state "[could] get into that stuff and [the trial court] did not allow the defense to present the mitigation." *See Skipper v. South Carolina*, 476 U.S. 1, 5 (1986); *see also Simmons*, 512 U.S. at 164 (holding Simmons, like Skipper, "was prevented from rebutting information that the sentencing authority considered"). The record shows no indication that Hulsey waived the objection or wanted future dangerousness to go unrebutted.

### 3. Harmless error review

**¶141**          As in *State v. Rushing* and *Escalante-Orozco*, this Court need not consider whether *Simmons* error could ever be harmless because the State has failed to prove "beyond a reasonable doubt that the error did not contribute to or affect the verdict or sentence." *State v. Rushing*, 243 Ariz. 212, 222 ¶ 42 (2017); *Escalante-Orozco*, 241 Ariz. at 286 ¶ 126; *Henderson*, 210 Ariz. at 567 ¶ 18. The State argues that the error was harmless because (1) the powerful evidence supporting aggravation was far more impactful than the instruction, and (2) the jury was adequately informed of Hulsey's parole ineligibility through counsel's arguments. The State has not met its burden

of proving harmlessness beyond a reasonable doubt. *Escalante-Orozco*, 241 Ariz. at 286 ¶ 126; *see also State v. Valverde*, 220 Ariz. 582, 585 ¶ 11 (2009) ("A reviewing court will affirm a conviction despite the error if it is harmless, that is, if the state, in light of all of the evidence, can establish beyond a reasonable doubt that the error did not contribute to or affect the verdict." (internal quotation marks omitted)).

¶142 The jury found two aggravators. But the first aggravating factor, killing an on duty officer, was an element of the crime itself; that is, killing an officer in the line of duty. Every defendant convicted of that crime will be subject to the aggravating factor, whether or not charged. The second aggravating factor, conviction for the attempted murder of Officer Goitia, arose out of the gunfire that resulted in the death of Officer Holly, and that conviction was then used as an (F)(2) aggravating factor. Hulsey presented considerable mitigation evidence including testimony regarding his mental illness and testimony from six family members. The jurors carefully considered the mitigation, as shown from the jurors' request to see the mitigation tapes again and the fact that it took the jurors a total of eight hours, over the course of more than four days, to reach a death verdict. The jurors would have also been aware of Hulsey's relative youth. He was thirty-three years old at the time of the offense and his second count had a presumptive 10.5-year sentence. This may have caused some jurors to fear that he might be released from prison someday.

¶143 Additionally, although Hulsey's attorney suggested during closing argument that there was no option for parole, his argument was not sufficient to dispel *Simmons* error in the face of the trial court's erroneous instructions in the aggravation phase regarding possible future release. In *Shafer*, the United States Supreme Court found unpersuasive the state's argument that counsel's closing pleas cured the *Simmons* error. 532 U.S. at 52; *see also Kelly*, 534 U.S. at 257 (finding counsel's curative statements inadequate to "convey a clear understanding" of parole ineligibility). Like the arguments made by Hulsey's counsel, Shafer's defense counsel argued that the defendant will "die in prison" after "spend[ing] his natural life there." *Shafer*, 532 U.S. at 52. But unlike the case here, the trial court in *Shafer* also instructed the jury that "life imprisonment means until the death of the defendant." *Id.* As in *Shafer*, counsel's statements that Hulsey will

die in prison did not adequately inform the jury that parole is no longer available to adult felons in Arizona. Jurors must be correctly informed of the controlling law by the court.

**¶144**    For the reasons set forth above, the State placed Hulsey's future dangerousness at issue, and the trial court erred by denying Hulsey an opportunity to inform the jury of his parole ineligibility. *See Simmons*, 512 U.S. at 168–69, 178. Even if we assume the error is subject to harmless error review, the State failed to prove beyond a reasonable doubt that the error did not contribute to the death verdict. The error was not harmless. *See Henderson*, 210 Ariz. at 567 ¶ 18. Due process therefore dictates Hulsey receive a new penalty phase trial.

### E. Abuse of discretion review

**¶145**    Hulsey argues that the jury abused its discretion in imposing the death sentence because (1) "these two crimes [i.e., the murder of Officer Holly and attempted murder of Officer Goitia] are what make up the only aggravating circumstances under A.R.S. § 13-751(F)(2), (10)"; and (2) the "mitigation was substantial and unrebutted by the State." This Court reviews all findings made in aggravation and the resulting death sentences for abuse of discretion, A.R.S. § 13-756(A), viewing the facts in the light most favorable to upholding the verdict. *State v. Gallardo*, 225 Ariz. 560, 565 ¶ 15 (2010).

**¶146**    As stated above, Hulsey's first argument fails because there exists no prohibition of a crime, or crimes, concurrently constituting elements of the crime and qualifying aggravating factors. *See supra* ¶¶ 65–66; *see also Burns*, 237 Ariz. at 23 ¶ 88 (holding circumstances of crime at issue may concurrently be used as aggravators); *Goudeau*, 239 Ariz. at 470 ¶ 220 (holding (F)(2) aggravator found through "contemporaneously committed predicate crime supporting" conviction at issue constitutional). In addition, the jury properly found (F)(2) proven based on its own finding of guilt for the attempted first degree murder of Officer Goitia. Finally, it is uncontroverted that Officer Holly was an on duty peace officer at the time he was killed. *See* A.R.S. § 13-751(F)(10).

¶**147**    As to Hulsey's substantial mitigation argument, even if we assume that each juror accepted all of the mitigating factors identified by Hulsey, a juror could reasonably have concluded they were not sufficiently substantial to warrant leniency.  Hulsey presented substantial mitigation evidence including evidence of mental illness and brain damage, his early childhood in a dysfunctional home, his father's drug use, the transfer of guardianship to his cruel grandmother, then a transfer to his father's strict household where Hulsey was physically abused.  Multiple family members also testified, and Hulsey presented evidence about his ability to function in a structured prison environment.  In response, the State in closing questioned whether Hulsey's difficult childhood was still having an effect on him, as he was thirty-three when he shot Officer Holly.  The prosecutor reminded the jury about Hulsey's past instances of violence, rebutted his evidence of good behavior in prison, and stated that his mental tests showed he had an above-average IQ.

¶**148**    Hulsey pulled a gun, aimed, and fired on two officers during a routine traffic stop.  His actions were unprovoked.  A reasonable juror could have concluded that the mitigation was not sufficiently substantial to call for leniency.  *See Escalante-Orozco*, 241 Ariz. at 294–95 ¶¶ 183–84 (finding defendant's familial issues inadequate to warrant leniency).  The sentence was not an abuse of discretion, and therefore Hulsey is eligible for the death penalty on remand.

### F.  Other constitutional claims

¶**149**    Hulsey lists twenty-six other constitutional claims, which he concedes have previously been rejected by this Court, but nonetheless wishes to raise to preserve for federal review.  We decline to revisit them.

### CONCLUSION

¶**150**    We affirm Hulsey's convictions of first degree murder and his prison sentence for his attempted murder conviction.  In light of the United States Supreme Court's decision in *Lynch III*, we vacate the death sentence and remand for a new penalty phase trial.